ISLAND PROPERTIES, INC., trustee, *vs.* MARTHA'S VINEYARD COMMISSION.

Suffolk.    December 10, 1976. — March 23, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Martha's Vineyard Commission.    Subdivision Control.    Zoning,* Amendment of by-law or ordinance.    *Statute,* Construction.

Discussion of the provisions of St. 1974, c. 637, an act "protecting land and water on Martha's Vineyard." [218-222]

Although the plaintiff's subdivision plan had been approved by the local planning board before the enactment of St. 1974, c. 637, development of the subdivision was subject to regulatory controls adopted pursuant to c. 637, inasmuch as G. L. c. 40A, § 7A, protecting a developer from changes in local zoning ordinances or by-laws, is not applicable to State legislation. [225-232]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on May 28, 1976.

The case was reserved and reported by *Braucher, J.*

*William G. Young* (*Daniel L. Goldberg* with him) for the plaintiff.

*Donald L. Connors* (*H. Theodore Cohen* with him) for the defendant.

*Catherine A. White,* Assistant Attorney General, for the Secretary of Communities and Development, amicus curiae, submitted a brief.

KAPLAN, J.    The plaintiff's predecessors, holding title to land located within the boundaries of the town of Oak

Bluffs on the island of Martha's Vineyard, obtained approval from the local planning board for definitive subdivision plans which were consistent with the town's zoning by-law. Shortly thereafter the Legislature passed and the Governor approved St. 1974, c. 637, "An Act protecting land and water on Martha's Vineyard." The question posed by this case is whether various regulatory controls adopted pursuant to the statute by the defendant Martha's Vineyard Commission, some of them more restrictive than the town by-law, should be held to apply to the locus, or whether — to the contrary — the locus is shielded from those controls by the familiar provision of G. L. c. 40A, § 7A (quoted at n.18 below),[1] which, when applicable, has the effect of "freezing" the local zoning ordinances or by-laws in favor of the developer for seven years from the date of his submission of the preliminary subdivision plan. We hold that § 7A does not govern in the situation presented by this case, and that the controls under chapter 637 apply here as they do to other developments proposed for areas on Martha's Vineyard within the authority of the commission. This is essentially because § 7A deals with amendments by local authorities of the local zoning provisions, and is not directed to standards and regulations, authorized by the State legislation, having regional or State-wide scope or significance affecting such local provisions.

1. This action for a declaration of rights was commenced in the Supreme Judicial Court for the county of Suffolk and was reserved and reported to the full bench, without decision, by a single justice of this court upon the pleadings and a statement of agreed facts with voluminous exhibits. It appears from the record that the locus, comprising the undeveloped parcels called Waterview III, IV, and V, borders on and is in the vicinity of Sengekontacket Pond, a major tidal pond. The relevant preliminary subdivision plans were submitted on October 25, 1973, with

---

[1] The parties agree that we have to deal with § 7A as amended through St. 1965, c. 366, § 1. General Laws c. 40A has been comprehensively revised by St. 1975, c. 808, § 3. The substance of the old § 7A appears in § 6 of present c. 40A.

the formalities required by the Subdivision Control Law,
G. L. c. 41, §§ 81K-81GG (the law having been "accepted"
by Oak Bluffs), and definitive plans followed on April 12,
1974, and were approved by the town planning board on
June 7, 1974. The plan contemplated some 850 building
lots on 507 acres. The town by-law as of October 25, 1973,
prescribed, among other things, a minimum lot size of
10,000 square feet; setback of twenty-five feet from street
line (with certain provisos) and of twenty feet from side
lot and rear property lines; and height limitations of
thirty-two feet and two and one-half stories. (These provi-
sions applied alike to the single residence and general resi-
dence districts.)

The impingement of chapter 637 on the plaintiff's pro-
posed development and the occasion for seeking a declara-
tion become apparent from the terms of the statute and
the steps taken thereunder, to which we turn.[2]

2. Chapter 637 has novel, interlocking provisions which
call for some exposition. Cf. American Law Institute, A
Model Land Development Code, art. 7 (1976). The law
was introduced in substance as 1974 House Doc. No. 5567
under Governor Sargent's sponsorship in March, 1974, was
enacted with changes, and was approved on July 27, 1974.[3]

---

[2] We address ourselves to question 1 reserved and reported: "Whether
the plaintiff's land, which land is shown on definitive subdivision plans
approved under the Subdivision Control Law prior to the effective date
of Stat. 1974, c. 637 and has whatever benefits are afforded by G. L.
c. 40A, § 7A, as amended through Stat. 1965, c. 366, is subject to cer-
tain guidelines adopted by the Martha's Vineyard Commission pur-
suant to Stat. 1974, c. 637, as amended, in its designations of the Road,
Coastal, and Sengekontacket Pond Districts of Critical Planning Con-
cern, and any implementing regulations or moratorium arising there-
under."

[3] Governor Sargent's message appears as part of 1974 House Doc.
No. 5567. The draft bill (app. A) was referred to the House Committee
on Natural Resources and Agriculture which recommended passage of
an amended bill, 1974 House Doc. No. 6073. The Committee on Ways
and Means, to which the amended bill was referred, reported favorably
a further amended bill, 1974 House Doc. No. 6407. On motion of Rep-
resentative MacLean, 1974 House Doc. No. 6513, containing additional
amendments, was substituted for No. 6407; this became St. 1974, c. 637.
Chapter 637 has been amended by St. 1974, c. 759, and St. 1976, c. 219,
cited below.

It followed a proposal with similar objectives and the same sponsorship that had been introduced in August, 1973 (1973 House Doc. No. 7280).[4] The legislation was intended to respond (as the General Court could believe) to the threat of destruction of the ecological and other special values of the island through steeply increasing commercial developments of its land and water resources which would not be adequately contained or regulated merely by action that could or would be initiated by the individual towns.

Enacted as an emergency law effective immediately, chapter 637[5] declared that to prevent irreversible damage to the island and ultimately to its economy it was necessary to establish a regional commission with the purposes and powers set forth in the act. § 1. Martha's Vineyard Commission[6] consists of twenty-one members: one selectman or designee of the selectmen of each of the six towns comprising the island; nine persons elected at large, island-wide; four, not principally resident on the island, appointed by the Governor (who have voice but not vote); one county commissioner; and one member of the Governor's cabinet or designee[7] appointed by the Governor. § 2.[8] For twelve months following the organization of the com-

---

[4] 1973 House Doc. No. 7280 was accompanied by a message from the Governor. We do not trace its history except to note that after committee action, most of it favorable, it was one of the bills (renumbered as 1973 House Doc. No. 7479) ordered to be studied by the Senate Committee on Ways and Means (see 1973 Senate Doc. No. 2057, November 30, 1973). No further action on the measure is reported.

[5] In the paraphrase of the statute which follows in our text, we necessarily omit some of the features and details of the statute and often depart from its language.

[6] Territorially, the statute extends to all lands and inland waters of the county of Dukes County (Martha's Vineyard and the Elizabeth Islands), subtracting the Elizabeth Islands, certain lands in the town of Gay Head, and lands owned by the Commonwealth or its agencies. § 2.

[7] As to "designee" see St. 1976, c. 219, § 1, amending c. 637, § 2.

[8] Section 2 provides that if relevant Federal legislation is enacted, the commission shall be enlarged to include the Secretary of the Interior or his designee. The prolonged efforts to secure protective Federal legislation, which still continue, need not be described here.

mission, or until forty-five days after approval by the Secretary of Communities and Development of standards and criteria (described below), whichever period was shorter, a moratorium was imposed on the granting by town authorities of permits for developments on any considerable scale (a development permit being defined as any permission required to construct or alter a building or improve land). §§ 7, 6 (fourth paragraph). (In fact, the commission was organized on December 5, 1974; approval of the standards and criteria occurred on September 8, 1975, terminating the moratorium on October 23, 1975.)

Within a year of the enactment the commission was to formulate and submit to the Secretary for his approval two sets of standards and criteria: one for use by the commission in determining whether a proposed district of the island was of "critical planning concern" (CPC), and a second for use by the commission and town authorities in deciding whether a proposed development was a "development ... of [i.e. having] regional impact" (DRI). § 8.

The commission was empowered, after notice to the towns involved and notice and public hearing pursuant to G. L. c. 30A, § 2 (State Administrative Procedure Act), to designate CPC districts in accordance with the relevant approved standards and criteria. Such a district must qualify in any case as possessing unique resources (natural, historical, ecological, scientific, or cultural) of regional or Statewide significance; or as having marginal soil or topographic conditions rendering it unsuitable for intense development; or as being significantly affected by, or having significant impact on, an existing or proposed major public facility (as defined)[9] or other area of major public investment. A procedure is described for the nomination

[9] Defined in § 9 to include any public facility operated by a town primarily for the benefit of the residents of that town, any street or highway not maintained as part of the State or Federal highway system, or any educational institution serving primarily the residents of one town.

of CPC districts.[10] The commission is required to explain its actions with regard to nominations. If it decides to designate a CPC district, it must accompany the designation with a specification of guidelines for the development of the district, based on considerations such as possible water, air, land or noise pollution, burdening of water supply, beach erosion or damage to the littoral ecology or wetlands. § 9.

Upon designation of a CPC district, each town whose boundaries include any part of the district may, subject to approval or amendment by the commission, adopt regulations conforming to the applicable guidelines, having for the purpose all the powers it otherwise had under the General Laws; if a town fails to propose regulations, the commission on notice and hearing formulates them for the town. § 11. These regulations (and regulations specifying conditions for DRI's: see below) may include any type of regulation which may be adopted by any city or town under the General Laws as noted in the margin;[11] they may differ from the otherwise relevant local development ordinances and by-laws in their scope and magnitude when the latter are clearly restrictive of the commission's purposes.[12] § 3. Whether or not the regulations for a CPC

---

[10] Subject to certain emergency exceptions, the commission's acceptance of a nomination for consideration suspends a town's power to grant development permits applicable within the proposed district. § 10.

[11] Section 3 (second paragraph) states: "In adopting such regulations, the commission may include any type of regulation which may be adopted by any city or town under the following general laws, as amended: chapter forty, section eight C, the Conservation Commission Act; chapter forty A, the Zoning Enabling Act; chapter forty C, the Historic Districts Act; chapter forty-one, sections eighty-one E through eighty-one H, as they relate to official maps; chapter forty-one, sections eighty-one K through eighty-one GG, the subdivision control law; chapter one hundred eleven, section twenty-seven B, as it relates to regional health boards; and chapter one hundred thirty-one, sections forty and forty A, as they pertain to the protection of wetlands."

[12] Section 3 (third paragraph) states in part: "In adopting regulations or specifying conditions which would not otherwise be permitted or required by existing local development ordinances and by-laws the commission shall describe in writing and present evidence which demonstrates that the public health, safety, and welfare would be endan-

district were proposed by a town, they are incorporated into the town's ordinances and by-laws (without regard to G. L. c. 40, § 32, as to validation of by-laws by the Attorney General) and are in the first instance to be administered by the town as if they were part of its development ordinances and by-laws. § 11; cf. § 10.

As noted, the commission also submits standards and criteria for the Secretary's approval specifying the types of DRI's — that is, developments which, because of their magnitude or the magnitude of their effect on the surrounding environment, are likely to present development issues significant to more than one town. § 13 (listing considerations). When a permit for a development is sought from town authorities, they determine initially whether it is a DRI, and, if so, refer the application for the permit to the commission. § 14. The commission then, on notice and hearing, decides whether to allow the town to issue the permit; it is to consider probable benefits and detriments, the relation of the development to the objectives of the general plan of the town or of the island, the consistency of the development with the town's by-laws or with the regulations of any relevant CPC district, and, in case of inconsistency with by-laws, whether an inconsistency is justified. § 15 (as amended by St. 1976, c. 219, § 2). The commission's consideration is not limited to the situation of the town that referred the development proposal, but extends to the impact on areas within other towns, as well as to examination of available alternative locations on the island. § 16. In approving a DRI the commission may specify conditions to be met by the developer. § 17.

3. The commission took action under chapter 637 as follows. It duly prescribed standards and criteria for desig-

gered or that irreversible damage would result to natural, historical, ecological, scientific, or cultural values on Martha's Vineyard by the continuing application of the existing local development ordinance or by-law as it applies to the specific district of critical planning concern or development of regional impact which the commission is considering."

Island Properties, Inc. *v.* Martha's Vineyard Commission.

nation of CPC districts and for DRI's which were approved by the Secretary on September 8, 1975. For immediate purposes we need to acquaint ourselves with the former, called "Critical Planning District Qualifications." These provide that a CPC district may be designated only when there is a regional need for special regulations or planning to protect the given area, and when damage through failure to regulate or plan will involve substantial loss to the region or to two or more towns. Then follow specific characteristics that point to CPC designations; these are arranged under the headings of drinking water resource, fishing resource, farming resource, wildlife, natural, scientific, or ecological resource, cultural or historic resource, economic or development resource, major public investment, and "hazardous."

On December 22, 1975, after compliance with statutory requirements of form as well as substance, the commission designated two CPC districts of interest to us because each district embraces some part of the locus (although the record does not vouchsafe with precision just how much in either case).

There is first an "Island Road District." This takes in a zone adjacent to or associated with the major roads of the entire island, and a second zone related to special ways. There are guidelines applicable equally to both zones, and separate guidelines for each: guidelines for the major road zone describe the allowed height of structures[13] and the rather broad uses allowed with or without permit; for the special ways zone, guidelines describe development patterns and the uses allowed with or without permit or prohibited.[14]

---

[13] The guidelines provide that, except by special permit, structures within this zone shall not exceed eighteen feet for a pitched roof and thirteen feet for a flat roof.

[14] The guidelines speak to the procedures for applying for and issuing special permits.

The commission reserves the right, in appropriate cases, on notice and hearing, to permit a town to adopt regulations less restrictive than the guidelines. (The same reservation is made with respect to the guidelines for the other two CPC districts mentioned below.)

The second CPC district designated by the commission is a "Coastal District" which embraces essentially all the coastline of the island, and areas of the major coastal ponds, harbors, and tributary streams and wetlands feeding the coastal ponds (with definitions and exclusions). Guidelines for a shore zone admit of only quite restricted uses.[15] For an inland zone, guidelines allow single family residences but with restrictions aimed particularly at water supply and sanitary disposal facilities and with limitations on the height of structures.[16] There are also guidelines for similar uses in areas associated with streams and wetlands draining into the coastal great ponds.

On March 4, 1976 (with clarification on March 18), the commission designated a third CPC district, the "Oak Bluffs Sengekontacket Pond District."[17] This comprises

[15] This zone consists of the land from mean low water to 100 feet inland of the inland edge of any beach or marsh grasses, and 100 feet inland of the crest of any bluff exceeding a height of fifteen feet.

[16] The guidelines restrict height in open terrain to eighteen feet for a pitched roof and thirteen feet for a flat or shed roof, and, in wooded terrain, to twenty-four feet for a pitched, and thirteen for a flat or shed roof; but a town may vary the heights consistently with landscape, subject to the commission's approval.

[17] The commission's decision in explaining "Why the Area Has Been Designated," states in part: "Information available to the Commission supports a finding that the Pond District is of regional importance, that there exist problems of uncontrolled or inappropriate development within the District, and affecting areas outside the District, indeed the entire Island, and that there are advantages to be gained by development of the area in a controlled manner. The Commission specifically finds that controlled development of lands and waters within the Pond District is essential to the prevention of pollution of ground and surface waters, the protection of water quality, and to preserving an adequate water supply. In addition, lands and waters within the Pond District contain, support and affect important wildlife habitats. They are essential to marine and shell fishing within and affected by activities in the District, each of which is vital to the Island's economy. Traffic generated by development within this District will adversely affect the safety and welfare of Island residents and visitors. Development will probably overburden the ability of the Town to supply essential public services to present and future residents. Furthermore, this area contributes substantially to the Island's unique cultural, historic, and economic values. This area offers irreplaceable views and there exist in the District important outdoor recreational opportunities. As fragile resources, lands and waters within the District are extremely sensitive to pollution, and the destruction of irreplaceable resources."

the lands and waters within Oak Bluffs adjacent to the pond, exempting (except as to the water monitoring guideline mentioned below) the developments called "Sengekontacket Properties" and "Waterview Farms I and II" where construction was already substantially completed. The locus in the present case lies within the district boundaries and amounts to eighty-seven per cent of its unexempted area. A density guideline limits development permits so as to achieve an average for the district not exceeding one dwelling unit per 60,000 square feet of area, and a further guideline imposes a growth control for new building permits and associated sanitary disposal facility installation and water supply connection permits at an annual rate not exceeding one-twentieth of the permits issuable under the density guideline. (The growth rate is to be reviewed every three years.) A detailed ground water monitoring program is established.

It remains to say that the commission pursuant to § 11 has lately adopted overlay or supplementary regulations for the town of Oak Bluffs (the town apparently having offered no proposed regulations) pursuant to the guidelines promulgated by the commission under its designations of the three pertinent CPC districts.

4. (a) The plaintiff's case is founded on G. L. c. 40A, § 7A, reproduced in the margin;[18] otherwise the plaintiff

---

[18] Section 7A, as amended through St. 1965, c. 366, § 1, provides: "When a preliminary plan referred to in section eighty-one S of chapter forty-one has been submitted to a planning board, and written notice of the submission of such plan has been given to the city or town clerk, the land shown on such preliminary plan and on the definitive plan evolved therefrom, or in the absence of a preliminary plan, the land shown on a definitive plan submitted under the provisions of the subdivision control law, shall be governed by applicable provisions of the zoning ordinance or by-law in effect at the time of submission of the plan first submitted while such plan or plans are being processed under said subdivision control law; and, if said definitive plan becomes approved, or is disapproved and thereafter amended and duly approved, said provisions of the ordinance or by-law in effect at the time of the submission of the first submitted plan shall govern the land shown on such approved definitive plan, for a period of seven years from the date of endorsement of such approval notwithstanding any other provision of law; provided, that if a preliminary plan is submitted,

offers no challenge in this proceeding to the validity of chapter 637 or to the validity or regularity of any of the actions of the commission under that law as they bear upon the plaintiff or other landowners who may be in like position.[19] We may note here that while the record indicates that the plaintiff entered into financing arrangements and expended money after the approval of the definitive subdivision plans, the extent or reasonableness of any reliance involved is not shown, nor is it indicated in any detail how the plaintiff may fare in developing the locus under the regulatory controls which have been imposed pursuant to chapter 637.[20] (As to the plaintiff's legal situation apart from its § 7A contention, see 1 R.M. An-

---

the definitive plan is duly submitted within seven months from the date on which the preliminary plan was submitted. Disapproval of a plan shall not serve to terminate any rights which shall have accrued under the provisions of this section, provided an appeal from the decision disapproving said plan is made under applicable provisions of the subdivision control law. Such appeal shall stay, pending an order or decree of a court of final jurisdiction, the applicability to land shown on said plan of the provisions of any zoning ordinance or by-law which became effective after the date of submission of the plan first submitted.

"When a plan referred to in section eighty-one P of chapter forty-one has been submitted to a planning board and written notice of such submission has been given to the city or town clerk, the use of the land shown on such plan shall be governed by applicable provisions of the zoning ordinance or by-law in effect at the time of the submission of such plan while such plan is being processed under the subdivision control law including the time required to pursue or await the determination of an appeal referred to in said section, and for a period of three years from the date of endorsement by the planning board that approval under the subdivision control law is not required, or words of similar import, provided that a city or town may, in the manner prescribed in this chapter, increase the number of permitted uses of any land shown on such a plan."

[19] Section 18 of chapter 637 gives any party aggrieved by a determination of the commission a right of appeal to any court of competent jurisdiction which, after hearing all pertinent evidence, shall annul the determination (or remand to the commission or make other just disposition) on finding that it is unsupported by the evidence or exceeds the authority of the commission.

[20] This is not to minimize the difficulties which individual developers may well have encountered because of the moratorium of § 7, and the waiting period of § 10 with respect to CPC districts.

derson, American Law of Zoning § 4.27 [2d ed. 1976], and, e.g., *R.A. Vachon & Son* v. *Concord,* 112 N.H. 107 [1972].)

(b) We go, then, to § 7A, in particular to its first paragraph applying to subdivision plans requiring approval of a planning board under G. L. c. 41, § 81S.[21] The plaintiff argues in effect that the words "the land . . . shall be governed by applicable provisions of the zoning ordinance or by-law in effect at the time of submission of the plan" exclude subsequent zoning laws (not merely zoning ordinances or by-laws), and that chapter 637 is a zoning law, although it is not so called.

In the first place, such a characterization is dubious. Assuming even that the General Laws referred to in § 3 of chapter 637 (see n.11 above), or rather their "types," represent the bounds of the commission's substantive powers, we observe that the references to the General Laws are not exclusively to zoning laws, nor, we believe, are the commission's standards and regulations to be thus exclusively characterized.[22] Alternatively, the plaintiff seems to retreat to the position that in so far as chapter 637 in § 3 refers to General Laws which can be denominated as "zoning" laws — thus as to laws which relate to height of structures and the like — chapter 637 should count as a zoning law and the commission's standards and regulations should to that extent be nullified in the present case by the freeze provision of § 7A, while any balance of the chapter 637 powers and of the commission's standards and regulations may remain applicable. But that would create a spotty situation indeed. In this view we may leave to another time the question of the correctness of the assumption made arguendo above that the commission's authority comprehends only the General Laws enu-

---

[21] In distinction to the second paragraph regarding subdivision plans under § 81P not requiring such approval. See *Bellows Farms, Inc.* v. *Building Inspector of Acton,* 364 Mass. 253 (1973).

[22] Illustrative of the awkwardness of trying to force the commission's controls entirely into a zoning mold is the plaintiff's attempt to denominate as "setback" the commission's description of the shore zone in its designation of the CPC Coastal District (see n.15 above).

merated in § 3, or their types, and does not draw more generally on the State's police powers.

But the entire contention falls because § 7A is not directed to subsequent zoning laws in a general sense, but only to zoning ordinances or by-laws subsequently passed by municipalities in the accustomed and ordinary way.[23] This, we believe, is the natural reading of the text of § 7A. The expression "zoning ordinance or by-law" is repeated several times; and that the subsequent enactment, which is not to "govern," must be of the same local character, is illustrated by the last sentence of the first paragraph of § 7A, which, speaking of a case where an appeal is being taken from disapproval of a subdivision plan, states: "Such appeal shall stay, pending an order or decree of a court of final jurisdiction, the applicability to land shown on said plan of the provisions of any zoning ordinance or by-law which became effective after the date of submission of the plan first submitted." We add that a reading of the successive versions of § 7A since 1957 (including the titles of the statutes) confirms us in this interpretation.[24]

---

[23] This category does not, in our opinion, include the regulations, compelled by the commission's guidelines, which are nominally incorporated into the town's ordinances and by-laws to be administered by the town as if part of the town's development enactments. See § 11.

That the commission's controls remain paramount is emphasized by § 10 (first paragraph) ("No municipality shall grant a development permit applicable within a district of critical planning concern except in accordance with regulations promulgated pursuant to section eleven"), and by § 14, which requires the towns to refer all DRI's to the commission.

[24] See St. 1957, c. 297; St. 1959, c. 221; St. 1960, c. 291; St. 1961, c. 435, § 2; St. 1963, c. 578, c. 591; St. 1964, c. 688; St. 1965, c. 65, c. 366, § 1. See, e.g., the title of St. 1963, c. 591, which brought in the language about the effect of an appeal from disapproval of a subdivision plan: "An Act providing that disapproval of a subdivision plan shall not terminate the exemptions of certain land from the applicability of zoning ordinances and by-laws."

As to the history of § 7A, see *Doliner* v. *Planning Bd. of Millis,* 343 Mass. 1, 7-9 (1961), 349 Mass. 691, 693-698 (1965); *Building Inspector of Acton* v. *Board of Appeals of Acton,* 348 Mass. 453, 456-457 (1965); *Vazza* v. *Board of Appeals of Brockton,* 359 Mass. 256, 259-264 (1971);

Chapter 637 is a polar opposite from those subsequent local enactments contemplated by § 7A. Not only is chapter 637 a statute of the General Court; the reason of its being is to import regional — island-wide and Statewide — considerations into the protection of the land and water of Martha's Vineyard, considerations which, the Legislature could believe, the towns themselves had not and would not severally bring to bear.[25] Our discussion of chapter 637 at points 2 and 3 above highlights its regional objectives and the techniques employed to further their attainment. The regional theme runs through the whole chapter from the makeup of the commission through the ultimate standards and regulations. It might be thought a perverse anomaly if these regional purposes could be thwarted, as to undeveloped resources requiring CPC or DRI status, by freezing and preserving for seven years preexisting local by-laws with narrow orientation.[26]

As to decisions dealing with § 7A, we noted in *Rayco Inv. Corp.* v. *Selectmen of Raynham,* 368 Mass. 385, 388 (1975), that they have involved "what were unquestionably amendments to zoning by-laws"; examples were the *Bellows Farms* case, *supra* note 21, *Smith* v. *Board of Appeals of Needham,* 339 Mass. 399 (1959), *McCarthy* v. *Board of Appeals of Ashland,* 354 Mass. 660 (1968), *Vazza* v. *Board of Appeals of Brockton,* 359 Mass. 256 (1971), and *Nyquist* v. *Board of Appeals of Acton,* 359

---

*Bellows Farms, Inc.* v. *Building Inspector of Acton,* 364 Mass. 253, 256-260 (1973); and as to the use of titles of the statutes as indicative of their meaning, see *Bellows Farms* at 258-259.

[25] In this sense chapter 637 invites comparison with G. L. c. 40B, §§ 20-23 (low and moderate income housing), considered in *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs,* 363 Mass. 339 (1973). Cf. *New York Cent. R.R.* v. *Department of Pub. Utils.,* 347 Mass. 586, 592 (1964).

[26] The plaintiff argues that if § 7A applies, the seven-year exemption should be further extended for the period of the moratorium of § 7 and the waiting period of § 10 of chapter 637. We do not reach this question (question 2 of the reservation and report) because we reject the argument under § 7A.

Mass. 462 (1971). The *Rayco* case itself is instructive because of the care shown in dealing with § 7A (second paragraph). There the subsequent town by-law in question stated in effect that the maximum number of outstanding mobile home park licenses issued by the board of health under G. L. c. 140 should not exceed at any time the number of such licenses issued by the board as of a past date, October 1, 1971. It was argued that the by-law was "grounded in the town's police power apart from the zoning power" (*id.* at 392), so that § 7A should not apply. But this court, observing (among other things) that the town had dealt with the subject of trailer parks in its previous zoning by-law, and that "[t]he board of health took no independent action in this case but rather has deferred to the town's decision" (*id.* at 391 n.3), decided to treat the subsequent by-law as a zoning by-law within § 7A. This court's circumspect approach to § 7A is notable; and we are reminded of the problem (which we have left undecided) about the reach of chapter 637 into the police powers beyond zoning.

(c) The effect of the foregoing discussion is that § 7A is not germane. But if § 7A were thought to apply by its terms, then the question would arise — it is argued in the briefs — whether, as a general enactment, § 7A should not be held to be inconsistent with the later, and specialized, chapter 637, and thus "repealed" pro tanto by that chapter to the extent of the action properly taken under it. Cf. *Doherty* v. *Commissioner of Administration*, 349 Mass. 687, 690-691 (1965). We leave unexplored the argument for such supersession, but do not minimize its apparent force, considering the emergency nature and comprehensiveness of chapter 637 and the cogency of a legislative purpose to take into the statutory scheme all undeveloped land and water which plausibly required treatment as CPC districts or DRI's. Within wide limits the General Court had power, if it chose, to legislate to supersede § 7A in this way, as it also had power to authorize the commission by chapter 637 to step in to establish regional standards

for development and to require the towns to cooperate in their enforcement.[27]

5. Attempting to strengthen its argument under § 7A, the plaintiff calls attention to the second paragraph of § 7 of chapter 637 (as amended to make "corrective changes" by St. 1974, c. 759), set out in the margin.[28] The language can be confusing unless read carefully with the full text of the chapter. A town planning board on the island is allowed to proceed with approval of a definitive subdivision plan under G. L. c. 41 submitted to the board before the effective date of chapter 637, and with consideration for approval after that date of any preliminary or definitive subdivision plan under c. 41 (but withholding approval during the temporary moratorium). The plaintiff suggests that if a planning board may now approve a definitive subdivision plan submitted before the chapter's effective date, then a definitive subdivision plan approved prior to that date (although such a case is not explicitly covered) must be a fortiori valid and impregnable. But the meaning is quite different. What is meant is that there may be approval or consideration for approval as far as c. 41 is concerned. Where the area involved does not fall within a CPC district and the plan discloses no DRI, chapter 637 will presumably interpose no final barrier, but

[27] See art. 89, § 8, of the Amendments to the Constitution of the Commonwealth; cf. *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs,* 363 Mass. 339, 383-385 (1973).

[28] Section 7 (second paragraph) states: "Nothing in this act shall be construed to prohibit the planning board of a town on Martha's Vineyard from approving any definitive subdivision plan pursuant to chapter forty-one of the General Laws, provided that such definitive subdivision plan was duly submitted to said planning board prior to the effective date of this act. Nothing in this act shall be construed to prohibit said planning boards from accepting for consideration for approval after the effective date of this act any preliminary or definitive subdivision plans pursuant to chapter forty-one of the General Laws, provided, however, that no approval on any such definitive plan shall be granted by a planning board before the end of the temporary moratorium, except for those subdivisions permitted by subparagraph (*e*) of the first paragraph of this section."

in the other kind of case approval of the plan, while satisfying c. 41, does not obviate the need for compliance with regulations and procedures under chapter 637.[29]

In conclusion, we decide in substance that the plaintiff is not, by reason only of G. L. c. 40A, § 7A, free of the regulatory controls of chapter 637.

We need hardly add that we are not entitled to express any opinion as to whether chapter 637 is good or bad legislation, or whether the commission has or has not done a useful job. Our function is limited to the issues of law presented by the record.

The case will be remanded to the single justice for the entry of a declaratory judgment in accordance with this opinion.[30]

*So ordered.*

---

[29] And see n.23 above, second paragraph.

[30] We acknowledge with thanks the submission of a brief on behalf of the Secretary of Communities and Development as a friend of the court.