### Robert Dalbec's Case.

No. 06-P-358.

Suffolk. January 17, 2007. - June 8, 2007.

Present: Rapoza, C.J., Green, & Sikora, JJ.

*Workers' Compensation Act,* Impartial medical examiner, Amount of compensation.

This court concluded that an administrative judge of the Department of Industrial Accidents correctly determined that the employee was disabled from the performance of his prior duties — even though an impartial medical examiner opined that the employee was capable of a return to full employment — given the vulnerabilities of the medical examiner's analysis, the underestimation of the arduous details of the employee's regular work, the employee's credible account of his physical limitations, and his age and employment history [313-316]; however, this court vacated the amount of award of partial disability and remanded the matter for a reasoned computation of the monetary figure [316-317].

Appeal from a decision of the Industrial Accident Reviewing Board.

*William C. Harpin* for the insurer.

*Joseph S. Samra, Jr.,* for the employee.

Sikora, J. In this workers' compensation case we consider the weight due the opinion of an impartial medical examiner. In this instance the medical examiner found the injured employee capable of a return to full employment. That opinion furnished the sole expert evidence upon the medical status of the employee. Nonetheless, an administrative judge and the reviewing board (board) of the Department of Industrial Accidents (department) overrode the opinion of the medical examiner. They found the employee disabled from the performance of his prior duties and entitled to awards for temporary total disability and for ongoing partial disability. We affirm the findings of disability; but we vacate and remand the amount of the award to the board for a reasoned computation.

*Procedural history.* On December 10, 2002, Robert Dalbec fell and injured his right shoulder. He was working as a tanker truck driver. At the moment of the fall he was engaged in the delivery of liquid chemical material to underground storage tanks at the American Polymers Company in Oxford.

He continued to work with some discomfort. In March of 2003, a magnetic resonance image (MRI) procedure revealed the injury commonly known as a torn rotator cuff. On July 15, 2003, Dalbec underwent surgical repair of the tear. He has not returned to the job of tanker truck driver since the surgery.

He was working under an employment contract with Sons Transportation, Inc. (employer). The employer's workers' compensation insurer, Granite State Insurance Company (insurer), began payment of temporary total disability benefits promptly after the surgery. Pursuant to G. L. c. 152, § 34,[1] the insurer maintained payments through December 30, 2003, and then discontinued them. Dalbec sought their resumption. To resolve the dispute, the parties participated in a conference at the department pursuant to G. L. c. 152, § 10A,[2] in May, 2004. As a result of the conference, the presiding administrative judge ordered the payment of total disability benefits through May 17, 2004; and the payment of temporary partial disability benefits thereafter under G. L. c. 152, § 35.[3] Both Dalbec and the insurer appealed

[1]General Laws c. 152, § 34, as last amended by St. 1991, c. 398, § 59, directs the insurer to pay the injured employee compensation equal to sixty percent of his or her average weekly wage before the injury "[w]hile the incapacity for work resulting from the injury is total." At the same time it imposes a cap figure known as "the maximum weekly compensation rate," statutorily defined as "the average weekly wage in the Commonwealth" as last calculated before the injury by the Division of Employment and Training. See G. L. c. 152, § 1(10). Section 34 limits the duration of such compensation to 156 weeks.

[2]As a first step for resolution, G. L. c. 152, § 10A, directs the assignment of a disputed claim to an administrative judge of the department for a conference within twenty-eight days and for resulting orders (within seven days) requiring, denying, modifying, or terminating weekly compensation or other benefits (including compensation for lost earnings and health care services).

[3]General Laws c. 152, § 35, as amended by St. 1991, c. 395, § 63, directs the insurer to pay the injured employee weekly compensation measured by a percentage of his lost income differential, capped at twice the amount of the average weekly wage in the Commonwealth "[w]hile the incapacity for work resulting from the injury is partial." The provision limits the duration of payments to 260 weeks.

from the conference order and sought a hearing pursuant to G. L. c. 152, § 11.[4]

In advance of the hearing and in accordance with G. L. c. 152, § 11A(2),[5] Dalbec underwent examination by a medical examiner on June 30, 2004. The medical examiner submitted a written report. He assessed Dalbec to be capable of return to full employment as a tanker truck driver as of June 30, 2004.

A second administrative judge conducted a G. L. c. 152, § 11, evidentiary hearing on March 22, 2005. Among other information, he received in evidence the medical examiner's report and the live testimony of Dalbec. In addition, the parties had deposed the medical examiner for purposes of cross-examination, as authorized by G. L. c. 152, § 11A(2), third par.[6] Counsel for Dalbec and the insurer submitted the deposition transcript for consideration by the administrative judge with all other evidence and information admitted at the hearing.

On June 1, 2005, the administrative judge issued a written decision. He ordered the insurer to pay temporary total disability benefits under § 34 from July 15, 2003 to May 17, 2004; and to pay continuing temporary partial disability benefits under § 35 thereafter.[7] On January 9, 2006, the board summarily affirmed the decision. The insurer filed a timely appeal in accordance with G. L. c. 152, § 12(2).

*Factual background.* The exhibits and testimony received by

---

[4]General Laws c. 152, § 10A(3), authorizes an appeal within fourteen days of the entry of an order. Section 11 directs the "member," i.e., the administrative judge, to make "such inquiries and investigations as he deems necessary, and [to] require and receive any documentary or oral matter not previously obtained as shall enable him to issue a decision with respect to the issues before him." G. L. c. 152, § 11, as amended by St. 1985, c. 572, § 25.

[5]General Laws c. 152, § 11A(2), as amended by St. 1991, c. 398, § 30, provides that parties must agree upon an impartial medical examiner from the roster maintained by the department for examination of the injured employee involved in "a dispute over medical issues." The examiner must submit a report to each party at least one week before the § 11 hearing.

[6]Section 11(A)(2) of G. L. c. 152 provides, in pertinent part, "The report of the impartial medical examiner shall be admitted into evidence at the hearing. Either party shall have the right to engage the impartial medical examiner to be deposed for purposes of cross examination."

[7]In addition, Dalbec sought and received an award for reasonable health care services necessitated by his injury, as authorized by G. L. c. 152, §§ 13 and 30.

the administrative judge in the course of the G. L. c. 152, § 11, hearing support the following findings.

Robert Dalbec was born in 1941, and graduated from Worcester Boys Trade High School in 1958. From 1957 to 1970 he worked at International Harvester Company as a truck mechanic. From 1970 to 1983 he labored as a bricklayer; and from 1983 to 1990 as a maintenance man at Atlas Distributors Company.

From 1990 to the time of his surgery in 2003, he worked as a tanker truck driver for the employer. He owned his tractor vehicle. Under his employment contract, he used the tractor to haul tankers owned by the employer and filled with a hazardous material known as styrene monomer. As a daily agenda, he drove the tractor to the employer's lot near Worcester, connected an empty tanker to the tractor, drove it to loading docks in New Haven, Connecticut, filled the tanker with the liquid chemical, hauled it to the American Polymers Company in Oxford, and emptied the styrene polymer liquid into underground tanks at that site. He worked Monday through Friday from 1:00 A.M. to 12:00 P.M. He made two round trips per shift between New Haven and Oxford. During a typical workday, he devoted about eight hours to driving. The work required him to hold a Class 1 commercial driver's license; to maintain a certification in the management of hazardous materials; and to pass an annual physical examination prescribed by the Federal Department of Transportation.

His daily work routine was strenuous. In order to climb into the cab of his tractor five feet above the pavement, he had to pull himself upward from a running board by gripping an overhead grab bar beside the driver's door with his extended right arm and hand. To descend from the cab he would grip the same bar and reverse the process. During a typical day he would make about twenty-four trips to the cab. The tractor steering wheel had a diameter of two feet. He gripped it at the 9 and 3 o'clock positions. The tractor had thirteen gears and required frequent manual shifting at lower speeds. He shifted by reaching forward with his right arm. The steering and shifting controlled all eighteen wheels of the combined tractor tanker. The fully loaded tanker weighed 18,000 pounds.

Each day he fueled and drove the tractor from his home to

the employer's terminal. He next connected a tanker to the tractor by cranking up landing gear, attaching air hoses, and fastening electrical lines between the two vehicles. These tasks required bending and overhead reaching. He then drove for two hours to New Haven.

At the loading docks there he filled his own tanker. He climbed to the top of the tanker by one of two methods: either by an eleven- to twelve-foot high metal ladder mounted on the side of the tanker, or by a ten-foot ladder mounting a platform beside the tanker. Either route required hand-over-hand climbing. If he used the platform, he had to reach overhead and lower a heavy wooden catwalk down the spine of the tanker top. He would make his way along the top and remove six bolts to open a heavy metal bulkhead. He would reach overhead and with both arms pull down a spring-loaded hose and hold it in place against the bulkhead opening for the fifteen to twenty minutes required to fill the tanker with the styrene liquid. He would then stow the hose, secure the bulkhead, lift and stow the catwalk if necessary, and climb down the vertical ladder. After completing paperwork and weighing out, he drove for two hours to American Polymers in Oxford.

There he would back up to an assigned underground tank, remove two twelve-foot hoses from adjacent fence harnesses, and fasten them to the rear of the tanker by means of metal locks. Each hose had a diameter of three inches, weighed about fifty pounds, and consisted of heavy rubber braced in metal collars. Each storage harness sat on a fence above eye level. Dalbec would reach up, dislodge the hoses, and carry them five or six feet to the rear tanker hull; he then would open a valve and pull an emergency lever to begin the flow of the chemical fluid and vapor from the tanker to the underground storage chamber. That transfer required thirty-five to forty minutes. At the end of it Dalbec would unfasten the hoses and hold them up in order to drain any residual liquid into the underground tank, and then return them to their overhead fence harnesses.

He would make a second round trip to New Haven and repeat these tasks. At the conclusion of the second delivery to the American Polymers storage site, he would return to the employer's terminal in Worcester, disconnect the tanker by removal of its

landing gear, air hoses, and electrical lines, and then drive the tractor home.

On December 10, 2002, Dalbec slipped and fell on ice in the American Polymers lot during his second delivery of the day. An MRI of March 3, 2003, showed the rotator cuff tear. Dalbec worked until the time of surgical repair on July 15, 2003. His orthopedic surgeon referred him to extended postoperative physical therapy. From September, 2003, through April, 2004, he underwent forty-nine sessions of therapy. The shoulder remained weak. He described himself as unable to lift even "two pounds." During 2004 and 2005 he made several appointments with his surgeon. By the time of his hearing pursuant to G. L. c. 152, § 11, on March 22, 2005, the surgeon had concluded that he had reached a disappointing end point.

At the hearing Dalbec testified that he continued to experience pain and weakness in the shoulder when he extended his arm or raised it above his head; and that he could not hold even a gallon of milk in his extended right arm. He felt unable to mount a tractor cab, connect a tanker, climb ladders, or lift hoses.

The medical examiner, an orthopedic surgeon, evaluated Dalbec on June 30, 2004, or about ten months before the hearing pursuant to G. L. c. 152, § 11. He submitted a two-page report. In it he concurred in the diagnosis of a traumatic right rotator cuff tear. His physical examination found Dalbec to have "responded favorably to physical therapy" and to have "good strength of the arms, forearms, and hands" and "pretty symmetrical range of motion." In his concluding assessment, he observed that most patients after rotator cuff surgery "lack endurance for activities above the shoulder, but can perform routine tasks. After all the shoulder is not normal. I am perplexed as to why the patient has not wanted to return to work. He has excellent range of shoulder motion, good strength, and complains of discomfort primarily when reaching out to the side. . . . I don't doubt that he has discomfort at night, but at the same time that is not a qualification for total disability." He concluded that Dalbec was then capable of full return to work. The written report does not discuss the specific tasks of Dalbec's job routine or the alternative of partial incapacity for those particular duties.

At his deposition ten months later (the transcript of which the administrative judge incorporated into the record of the hearing pursuant to G. L. c. 152, § 11), the medical examiner acknowledged that he had not tested Dalbec's overhead range of arm motion or arm strength; that endurance of overhead arm strength and motion after rotator cuff repair are usually uncertain; that no repair brings the patient back to normal; that Dalbec would remain at greater risk than the general public for reinjury; and that a repeated tear during his driving would pose a safety hazard for him and for others on the road. When counsel reminded the medical examiner of Dalbec's detailed work shift tasks, he sustained his opinion that Dalbec could perform them. He included the qualifications that Dalbec would experience aching until he recovered his full endurance and that he should begin with half-time shifts and progress gradually to full time in accordance with his tolerance.

The administrative judge found "completely credible" Dalbec's description of "pain and limitation in his right major shoulder. When he reaches his right extremity above shoulder level he suffers great pain, and the longer he holds it out the greater the pain." The judge found that the duties of a tanker truck driver uniquely "involved extensive and repetitive overhead use of the right arm" and that Dalbec "does not have the ability to perform [them]."

At the same time the judge found that Dalbec had the ability to drive a normal eighteen-wheel tractor trailer without duties of loading or unloading cargo; and that such positions earned $900 per week (in contrast to Dalbec's weekly wage of $2,042.27 as a tanker truck driver). He assigned that earning capacity to him and from it imposed on the insurer G. L. c. 152, § 35, partial disability weekly payments of $661.93 from April 28, 2004, onward.

*Discussion.* 1. *Standard of review.* Pursuant to G. L. c. 152, § 12(2), we review a decision of the board under the standards of the Administrative Procedure Act, G. L. c. 30A, § 14(7)(*a*)-(*d*) and (*f*)-(*g*).[8] The insurer wages this appeal, in effect, upon contentions under subsection (*c*) that the board has committed

---

[8]Review under the Administrative Procedure Act is restrained. The court sets aside or modifies an administrative adjudication only if the record shows it to be "(*a*) In violation of constitutional provisions; or (*b*) In excess of the

an error of law; and under subsection (g) that the award of disability is arbitrary, capricious, and an abuse of discretion. Both theories of appeal rest upon the same fundamental argument: that the board cannot lawfully or rationally substitute its judgment of disability for the sole medical assessment rendered by the medical examiner. We will examine that reasoning. Preliminarily we note that, in cases of summary affirmance of a decision of the administrative judge by the board, the reviewing court is inspecting the findings and reasoning of the administrative judge. *Coggin* v. *Massachusetts Parole Bd.*, 42 Mass. App. Ct. 584, 587 (1997). See *Ballard's Case*, 13 Mass. App. Ct. 1068, 1068 (1982).

2. *The determination of disability.* General Laws c. 152, § 11A(2), provides that the "impartial physician's report shall constitute prima facie evidence of the matters contained therein." Prima facie evidence is rebuttable, not conclusive. It

statutory authority or jurisdiction of the agency; or (c) Based upon an error of law; or (d) Made upon unlawful procedure; or . . . (f) Unwarranted by facts found by the court on the record as submitted or as amplified [in instances constitutionally requiring the court to make independent findings]; or (g) Arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." G. L. c. 30A, § 14(7), as amended by St. 1973, c. 1114, § 3.

By St. 1991, c. 398, § 32A, the Legislature eliminated from judicial review of workers' compensation decisions ground (e) authorizing invalidation of determinations lacking the support of substantial evidence. Consequently we do not analyze workers' compensation findings under the rules and corollaries of the substantial evidence doctrine. However, the lawfulness of a decision under subsection (c), and its rationality (freedom from arbitrariness, caprice, and abuse) under subsection (g), may well depend upon the sufficiency of evidence and information offered in support of it. The standards of review under § 14(7) do not function in neatly separate analytical compartments. See, e.g., *Narducci* v. *Contributory Retirement Appeal Bd.*, 68 Mass. App. Ct. 127, 136-137 (2007) (reviewing an administrative determination under overlapping tests of substantial evidence and arbitrariness). Therefore, as here, the discussions of lawfulness and rationality may at points resemble substantial evidence analysis of the now withdrawn subsection (e). However, the discussion is proceeding under the discrete standards of subsections (c) and (g). The resemblance does not constitute the reintroduction of the substantial evidence test into workers' compensation appeals. Rather, it reflects the fundamental requirement of rationality for every administrative decision. The reviewing court inquires "whether the decision is factually warranted and not '[a]rbitrary or capricious,' in the sense of having adequate evidentiary and factual support and disclosing reasoned decision making within the particular requirements governing a workers' compensation dispute." *Scheffler's Case*, 419 Mass. 251, 258 (1994).

"may be met and overcome by evidence sufficient to warrant a contrary conclusion." *Anderson's Case*, 373 Mass. 813, 817 (1977). In the workers' compensation adjudicatory scheme, the medical examiner's report may give way to a contrary conclusion for one or more reasons. The administrative judge may uncover deficiencies in its findings and reasoning, or incomplete knowledge of the nonmedical occupational demands of the employee's work. See *Scheffler's Case*, 419 Mass. 251, 259-260 (1994); *Ballard's Case*, 13 Mass. App. Ct. at 1069. See also *Smith* v. *Bell Atl.*, 63 Mass. App. Ct. 702, 718-720 (2005) (in an employment discrimination case, the trial judge could reasonably conclude that a medical expert lacked sufficient awareness of the plaintiff's general activities for a reliable attribution of her worsening condition to an employer's lack of workplace accommodations); *Young's Case*, 64 Mass. App. Ct. 903, 904 (2005) (a medial examiner's "opinion does not attain the status of prima facie evidence if it goes beyond the medical issues in the case"). Or the administrative judge may give decisive weight to the credible testimony of the worker about his limitations. See *Scheffler's Case*, 419 Mass. at 260; *Coggin* v. *Massachusetts Parole Bd.*, 42 Mass. App. Ct. at 589. The administrative judge may assign countervailing value to the worker's age, education, background, and prior employment history. See *Scheffler's Case*, 419 Mass. at 260; *Coggin* v. *Massachusetts Parole Bd.*, 42 Mass. App. Ct. at 589. The administrative judge may weigh also any separate medical evidence. *Id.* at 586 nn.4-5, 589. Those considerations worked largely against the medical examiner's opinion here.

First, the written report and deposition testimony of the medical examiner suffered from several weaknesses. The report omitted any description and analysis of the everyday regimen of Dalbec's tanker truck driving. At his subsequent deposition the medical examiner could not independently remember those working conditions. When counsel refreshed his memory or supplied information, he adhered generally to his original conclusion. However, cross-examination extracted a number of concessions undermining his conclusion. They included the omission of any test of Dalbec's overhead arm strength and motion; the uncertainty of postoperative overhead arm endurance; the conceded presence of pain or ache; and the heightened chance of reinjury.

Second, the medical examiner did not integrate the specific daily occupational chores with his medical opinion. If those medical problems of overhead strength, endurance, pain, and exposure to reinjury persisted, the medical examiner did not specifically explain Dalbec's ability to overcome them for performance of vertical climbing, the pulling and hauling of hoses, and the connection and disconnection of tankers.

Third, the administrative judge did find "completely credible" Dalbec's face-to-face testimony about "pain and limitation" in his right shoulder. To that observation the administrative judge added, as subsidiary findings, the circumstances of Dalbec's age, education, background, and employment history. At the time of the hearing, Dalbec was sixty-four years old. He had attended a trade high school and then worked continuously through a series of labor-intensive jobs for forty-six years. After his injury, he had worked in discomfort for an additional six months to the time of his required surgery. His work history contained no trace of the shirker or the malingerer. These circumstances tended to heighten his credibility and confirm his genuine inability to return to his prior work.[9]

Fourth, the assessment of Dalbec's ability to perform the essential tasks of his job was not a purely medical judgment. It necessarily involved evaluation of his occupational duties. As we have noted, the medical examiner failed to perform detailed analysis of the requirements of Dalbec's job. Since the ultimate judgment hinged on occupational as well as medical considerations, the administrative judge appropriately conducted a full, final, independent assessment.

---

[9]General Laws c. 152, § 11A(2), permits the administrative judge to receive "additional medical testimony when [he] finds [it] is required due to the complexity of the medical issues involved or the inadequacy of the report submitted by the impartial medical examiner." Here, the administrative judge did not formally authorize such additional testimony. However, in the course of the deposition of the medical examiner, counsel for Dalbec confronted him with two written evaluations by Dalbec's treating surgeon. The parties made the evaluations exhibits of the transcript submitted to the administrative judge. The surgeon specifically contradicted the medical examiner's conclusion. However, the administrative judge made no reference to this medical material in his reasoning and decision. We assume that he relied only upon the grounds specified in the administrative decision. They are fully adequate for affirmance on the issue of disability. The parties have not included the surgeon's evaluations in the appellate record. They play no part in our analysis.

In sum, the vulnerabilities of the medical examiner's analysis, the underestimation of the arduous details of the employee's regular work, the employee's credible account of his physical limitations, and his age and employment history outweigh the prima facie value of the medical examiner's report and substantiate the administrative decision of disability. See especially *Scheffler's Case*, 419 Mass. at 260.

3. *The amount of the partial disability award.* The administrative judge found that Dalbec did retain the capacity to drive "a normal 18 wheel tractor trailer" without the loading and unloading responsibilities of a tanker truck operator. He stated that "[s]uch positions earn approximately $900 per week." He assigned Dalbec that earning ability and imposed a resulting rate of a weekly partial disability payment of $661.93 upon the insurer.

The administrative record contains no factual source or reasoned explanation for the $900 figure. It is arbitrary within the meaning of G. L. c. 30A, § 14(7)(*g*). General Laws c. 30A, § 11(8), as inserted by St. 1954, c. 681, § 1, directs that "[e]very agency decision . . . shall be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision," unless legislation specifically exempts the decision from that requirement. The specific submission of workers' compensation decisions by G. L. c. 152, § 12(2), to judicial review under most of the standards of G. L. c. 30A, § 14(7), tends to confirm the natural inference that G. L. c. 30A, § 11(8), governs that adjudicatory work in the absence of a statutory exception.[10]

Dalbec points out that several decisions have approved of the authority of a board, an administrative judge, or a predecessor single member to consult their "own judgment and knowledge"

---

[10]General Laws c. 30A, § 1(2), as last amended by St. 1998, c. 161, § 232, excludes "the division of dispute resolution of the division of industrial accidents" from the definition of a covered "agency." However, G. L. c. 152, § 12(2), as last amended by St. 1991, c. 398, § 32A(2), subjects the adjudication of the reviewing board to the standards of G. L. c. 30A, § 14(7)(*a*)-(*f*) and (*g*). The explicit terms of a later specific statute supersede those of an earlier general one. See, e.g., *Doherty* v. *Commissioner of Admn.*, 349 Mass. 687, 690-691 (1965); *Island Properties, Inc.* v. *Martha's Vineyard Commn.*, 372 Mass. 216, 230-231 (1977).

of earning capacity in the absence of specific evidence from the injured worker (who carries the burden of proof of an amount) and the insurer. *O'Reilly's Case*, 265 Mass. 456, 458 (1929). *Percival's Case*, 268 Mass. 50, 54 (1929). *Mulcahey's Case*, 26 Mass. App. Ct. 1, 3 (1988). *Sylva's Case*, 46 Mass. App. Ct. 679, 681-682 (1999). The reason for this unusual license for the adjudicator is that, in cases resulting in a finding of partial incapacity, the worker asserting total disability and the insurer asserting no disability often will not have offered evidence of any intermediate earning capacity for fear of compromising their extreme positions. *Mulcahey's Case*, 26 Mass. App. Ct. at 3.

However, the precedents do not approve of the exercise of such judgment and knowledge with no explanation whatsoever.[11] The decision maker should explain the source and application of an earning capacity attributed to the worker in a vacuum of evidence from the parties. A concise explanation will assure compliance with the requirements of the Administrative Procedure Act[12] and with the bedrock principle of visible rationality.[13] A monetary figure cannot emerge from thin air and survive judicial review as a mystery.

*Conclusion.* For these reasons, we affirm the determination of § 34 temporary total disability until May 17, 2004; and the determination of § 35 partial disability from May 17, 2004, onward. We vacate and remand the amount of the partial dis-

---

[11]In three of the four cases, a rational basis for the disability figure is visible. In *Percival's Case*, 268 Mass. at 54, evidence supported the board's finding of a fifty percent disability ("it took [the worker] about twice as long to cover his territory as before his injury"). In *Mulcahey's Case*, 26 Mass. App. Ct. at 3, the single member assigned an earning capacity of $100 per week as an estimate of a minimal capacity for "work at the lower end of the wage scale." In *Sylva's Case*, 46 Mass. App. Ct. at 681, the findings of the administrative judge showed consideration of the employee's age, education, transferable skills, and degree of motivation, and, implicitly, the testimony of the worker's vocational expert. The remaining 1929 decision of *O'Reilly's Case*, 265 Mass. 456, long predated the requirements of the Administrative Procedure Act as adopted in 1954.

[12]General Laws c. 30A, § 11(8) (the requirement of written findings and reasoning); and § 14(7)(*g*) (the prohibition of arbitrary decisions).

[13]Even in the absence of an Administrative Procedure Act, the common-law writ of certiorari now codified in G. L. c. 249, § 4, would furnish judicial review for the prevention of arbitrary results. See *Yerardi's Moody St. Restaurant & Lounge, Inc.* v. *Selectmen of Randolph*, 19 Mass. App. Ct. 296, 302-304 (1985).

ability award for a reasoned computation.[14] In all other respects, we affirm the decision of the board.

*So ordered.*

---

[14]The figure of $900 appeared originally in the conference order of the first administrative judge. The second judge maintained it in his hearing decision. The appellate record contains no further information. On remand, the administrative judge may consult information already present in the case file, or reliable publications of labor statistics, or additional evidence.