COMMONWEALTH & others[1] vs. SCHOOL COMMITTEE
OF SPRINGFIELD & others.[2]

Suffolk. October 7, 1980. — February 18, 1981.

Present: HENNESSEY, C.J., QUIRICO, WILKINS, LIACOS, & ABRAMS, JJ.

*Constitutional Law*, "Anti-Aid" amendment, Use of public money or
property, Education. *Education*.

Discussion of criteria to be used in judging whether a statute violates art.
46, § 2, as amended by art. 103, of the Amendments to the
Massachusetts Constitution. [674-675]
The disbursement of public funds to private schools pursuant to certain
provisions of St. 1972, c. 766, is not for the purpose of aiding private
schools but is to aid specified children with special needs in obtaining the
education which is theirs by right and to assist the public school system
in providing the appropriate education for each child. [675-679]
The disbursement of public funds to private schools pursuant to certain
provisions of St. 1972, c. 766, does not substantially aid private
schools. [679-682]
The provisions of St. 1972, c. 766, which permit disbursement of public
funds to private schools for the education of children whose special
needs cannot be met by public schools do not promote aid to sectarian
institutions and are neither politically divisive nor financially waste-
ful. [682-683]
Disbursement of public funds to private schools for the purpose of provid-
ing special educational programs for those children whose special

---

[1] The Commonwealth brought this action through the Attorney
General, see G. L. c. 12, § 3, on its own behalf and as parens patriae for
the citizens of Springfield. Additional plaintiffs are the Board of Educa-
tion of the Commonwealth, and Gregory R. Anrig, as he is the Commis-
sioner of the Department of Education.

[2] Members of the school committee who are named as defendants are
Patricia Correira, Francis Coughlin, Wilbur Hogan, Daniel Lynch, Mary
Lynch, and Maureen Wark. Additional defendants are Theodore E.
Dimauro, mayor of Springfield and presiding officer (ex officio) of the
school committee, and James Fenlason, administrator of special educa-
tion for the Springfield school district.

needs cannot be met by the programs available in public schools, as permitted by St. 1972, c. 766, does not violate art. 46, § 2, as amended by art. 103, of the Amendments to the Massachusetts Constitution. [683]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 3, 1976.

The case was reported by *Wilkins, J.*

*Richard T. Egan,* Deputy City Solicitor, for the defendants.

*Donald K. Stern,* Assistant Attorney General (*Carolyn Wood,* Assistant Attorney General, with him) for the plaintiffs.

QUIRICO, J.   On February 3, 1976, the Commonwealth filed a complaint in the Supreme Judicial Court for Suffolk County, seeking declaratory and injunctive relief against the Springfield School Committee (school committee). The Commonwealth sought to enforce the rights of school-age children with special needs living in Springfield by an order requiring the school committee to comply with the provisions of G. L. c. 71B, inserted by St. 1972, c. 766, which is commonly referred to as "chapter 766." Specifically, the Commonwealth sought to require the school committee to enter into agreements with private schools and institutions to provide special education programs for those children whose special needs could not be met by the programs available in public schools. In its answer, the school committee contended that any such agreement with private institutions, other than institutions for the deaf, dumb, and blind, would violate art. 18, as amended by arts. 46 and 103 of the Amendments to the Constitution of Massachusetts (anti-aid amendment). By its counterclaim the school committee sought declaratory and injunctive relief prohibiting the Commissioner of Education from approving such private placements.

On March 25, 1976, on the Commonwealth's motion for a preliminary injunction, a single justice ordered the school committee to place students found to have special education

needs in appropriate schools approved for placement by the Department of Education (department), in accordance with the provisions of c. 766. Thereafter, on February 13, 1980, the parties submitted a statement of agreed facts; and a second single justice reserved and reported the case to the full bench for determination on the complaint, the answer and counterclaim, the order of the court on the plaintiff's motion for a preliminary injunction, and the statement of agreed facts with exhibits annexed.

The issue before this court is whether the disbursement of public funds to educate school-age children in approved private schools or institutions, when no public school program is available to meet the children's special education needs, as allowed under c. 766, exceeds the constitutional limits set by the current version of the anti-aid amendment, art. 46, as amended by art. 103.[3] For the reasons discussed below, we hold that c. 766 as enacted and implemented does not violate the anti-aid amendment to the Massachusetts Constitution.

1. *The statutory scheme.* Chapter 766 was passed to create "a comprehensive and complete program of evaluation and placement for children with special education needs."[4] *Board of Educ.* v. *Assessor of Worcester,* 368 Mass. 511, 515 (1975). To comply with the statute, and the regulations issued thereunder, see 603 Code Mass. Regs. § 28 et seq. (1979), a school committee must provide an appropriate,

---

[3] We left this question open in *Bloom* v. *School Comm. of Springfield,* 376 Mass. 35, 47-48 & n.23 (1978), and expressly declined to reach the question in *Amherst-Pelham Regional School Comm.* v. *Department of Educ.,* 376 Mass. 480, 486 & n.5 (1978).

[4] The statute defines a "[s]chool age child with special needs" as one "who, because of temporary or more permanent adjustment difficulties or attributes arising from intellectual, sensory, emotional, or physical factors, cerebral dysfunctions, perceptual factors, or other specific learning disabilities or any combination thereof, is unable to progress effectively in a regular school program and requires special classes, instruction periods, or other special education services in order to successfully develop his individual educational potential." G. L. c. 71B, § 1.

publicly supported education to each school-age child with special needs. G. L. c. 71B, §§ 2, 3-4. The school committee must diagnose and evaluate the needs of each child with special needs, propose a special individualized education program to meet those needs, and then provide or arrange for the special education program. G. L. c. 71B, § 3. Under c. 766, those individualized education programs may range from providing some extra help to a student who remains full-time in a regular classroom, to a full-time placement in a day or residential school. See G. L. c. 71B, § 2. The regulations promulgated under the statute further require that the special education child must be placed in the least restrictive program which meets the child's special education needs. 603 Code Mass. Regs. § 28, par. 322.2 (1979).

Under c. 766, children with special needs are "mainstreamed" to the maximum extent possible into regular public school programs. To that end, the statute encourages public development of a full range of educational programs within the public school system and through collaborative programs with other school systems. G. L. c. 71B, §§ 4, 10. Indeed, "the framers of c. 766 sought to design a system under which parents would no longer be required to go beyond their local school districts to find adequate, individually designed educational programs for children with special needs." *Amherst-Pelham Regional School Comm. v. Department of Educ.,* 376 Mass. 480, 490 (1978).

If no appropriate program is available within the public school system, however, c. 766 authorizes the school committee, with the approval of both the child's parents or guardian, and the department, and subject to constitutional limitations, to enter into contracts with private schools, agencies, or institutions to provide the necessary special education. G. L. c. 71B, § 4.[5] The statute impliedly re-

---

[5] Private placements may also occur if the parents reject the proposal of the school committee, and the department considers whether the pro-

quires, and the regulations explicitly mandate, public school education to the maximum extent possible; private school placements are permitted only as a necessary alternative. See G. L. c. 71B, §§ 2, 3; 603 Code Mass. Regs. § 28, par. 502.4 (i) (1979) (day and residential placements in private schools considered more restrictive than programs conducted in a regular public school facility); 603 Code Mass. Regs. § 28, par. 804.2 (1979) (at least once every three months, private schools must review the progress of each special education child toward placement of such child in a less restrictive program). Moreover, after the child is placed with the private school, the school committee must monitor the child's educational progress. G. L. c. 71B, §§ 2, 3. Additionally, by the terms of its contract with the school committee, the private school must agree to comply with all elements of the individual educational programs recommended for the special needs child placed in the school, and with all applicable requirements of the c. 766 regulations. 603 Code Mass. Regs. § 28, pars. 804.0-804.6 (1979).

The school committee pays, in the first instance, the expenses of instruction and support at such private schools, subject to some State and Federal aid. If the parents of a child placed in a private school are to bear any cost at all, they may be charged for support and care only. Parents may not be charged for any educational cost. G. L. c. 71B, § 10.

2. *The agreed facts.* We summarize the agreed facts. Because children with special needs include, among others, children with one or more specific physical handicaps such as deafness or blindness, children with learning disabilities such as dyslexia, children who are mentally retarded, and children with severe psychological problems, the same day

posed plan is an "appropriate education program." G. L. c. 71B, § 3. At that point the department can order a private school placement, and may also require reimbursement to the parents for monies already expended by them for their child's private school costs. G. L. c. 71B, § 10. G. L. c. 15, § 1G. See *Amherst-Pelham Regional School Comm.* v. *Department of Educ.,* 376 Mass. 480, 491-493 (1978).

school or residential school will not appropriately meet the needs of every child requiring special education services.

To meet the special needs of its school-age children, during the school year 1978-1979, Springfield provided service to 3,309 special needs children within the public school system. The programs provided ranged from a regular education program with modifications to a program of full-time teaching in a separate school. See 603 Code Mass. Regs. § 28, pars. 502.1-502.4 (1979), for a description of the various programs required to be made available to children under G. L. c. 71B, § 2. As of December 1, 1978, Springfield operated nine classes of full-time teaching conducted in a separate school.[6] The Springfield school committee has not, however, established any residential school programs for children with special needs within the school system.[7]

Instead, as of January 31, 1979, there were 108 Springfield students placed in day school programs, and 33 Springfield students placed in residential school programs outside of the public school system.[8] No available programs within the Springfield school system appropriately met the needs of those children. Moreover, the Springfield school department does not currently plan to establish day school or residential programs on a public basis beyond those programs

---

[6] While not a member of any collaborative, see G. L. c. 71B, § 4; 603 Code Mass. Regs. § 28, pars. 104.0, 201.1 (b)(1979), Springfield utilizes some collaboratives through tuition payments to provide services to a limited number of children. The record does not specify the number of children placed nor the prototypes provided by the Springfield school committee through collaborative efforts with other public school systems.

[7] No school system in Massachusetts, either alone or through a collaborative arrangement, developed a residential special education program between the 1972 enactment and the September 1, 1974, effective date of St. 1972, c. 766. Nor has any school system developed a residential education program to date.

[8] Approximately 140,000 children Statewide currently receive some kind of special education services. During the school year 1977-1978, 3,958 students were placed in day school programs, under 603 Code Mass. Regs. § 28, par. 502.5 (1979), and 1,569 were placed in residential programs under 603 Code Mass. Regs. § 28, par. 502.6 (1979), outside of the public school system Statewide.

now provided. Therefore, the Springfield school department envisions that private day and residential programs will continue to be required for those students whose clinical needs exceed the cost-effective capabilities of public education.

3. *The anti-aid amendment.* Article 18 of the Amendments,[9] as adopted in 1855, contained general and "rather uncertain language," *Bloom* v. *School Comm. of Springfield,* 376 Mass. 35, 39 (1978), concerning the use of public money for schools. Public dissatisfaction with art. 18 grew,[10] particularly as "public aid had been granted in several instances to private schools." *Id.* As a result, "a major subject of the constitutional convention of 1917 was proposals for a more specific amendment that would prohibit the practice altogether." *Id.* See also, 1 Debates in the Massachusetts Constitutional Convention 1917-1918, at 63, 67-68, 174-176 (1919).

The amendment voted by the convention and adopted by the people prohibited any use of public money or property for the aid of any private school, at any level of education.[11]

---

[9] Article 18 originally provided: "All moneys raised by taxation in the towns and cities for the support of public schools, and all moneys which may be appropriated by the state for the support of common schools, shall be applied to, and expended in, no other schools than those which are conducted according to law, under the order and superintendence of the authorities of the town or city in which the money is to be expended; and such money shall never be appropriated to any religious sect for the maintenance, exclusively, of its own school."

[10] There were repeated efforts in the Legislature, from 1900-1916, to revise art. 18. In 1917 one such bill was referred to the Constitutional Convention. R.L. Bridgman, The Massachusetts Constitutional Convention of 1917, 31 (1923).

[11] As adopted in 1917, art. 46 read: "Section 1. No law shall be passed prohibiting the free exercise of religion.

"Section 2. All moneys raised by taxation in the towns and cities for the support of public schools, and all moneys which may be appropriated by the commonwealth for the support of common schools shall be applied to, and expended in, no other schools than those which are conducted according to law, under the order and superintendence of the authorities of the town or city in which the money is expended; and no grant, appropriation

In 1974, the core prohibiting language of art. 46, § 2, was revised to eliminate the opening clause of the 1917 version.[12] However, the basic prohibition of the 1917 amendment, significant to the resolution of the instant case, was carried forward. That portion of art. 46, § 2, reads: "No grant,

or use of public money or property or loan of public credit shall be made or authorized by the commonwealth or any political division thereof for the purpose of founding, maintaining or aiding any school or institution of learning, whether under public control or otherwise, wherein any denominational doctrine is inculcated, or any other school, or any college, infirmary, hospital, institution, or educational, charitable or religious undertaking which is not publicly owned and under the exclusive control, order and superintendence of public officers or public agents authorized by the commonwealth or federal authority or both, except that appropriations may be made for the maintenance and support of the Soldiers' Home in Massachusetts and for free public libraries in any city or town, and to carry out legal obligations, if any, already entered into; and no such grant, appropriation or use of public money or property or loan of public credit shall be made or authorized for the purpose of founding, maintaining or aiding any church, religious denomination or society.

"Section 3. Nothing herein contained shall be construed to prevent the commonwealth, or any political division thereof, from paying to privately controlled hospitals, infirmaries, or institutions for the deaf, dumb or blind not more than the ordinary and reasonable compensation for care or support actually rendered or furnished by such hospitals, infirmaries or institutions to such persons as may be in whole or in part unable to support or care for themselves.

"Section 4. Nothing herein contained shall be construed to deprive any inmate of a publicly controlled reformatory, penal or charitable institution of the opportunity of religious exercises therein of his own faith; but no inmate of such institution shall be compelled to attend religious services or receive religious instruction against his will, or, if a minor, without the consent of his parent or guardian.

"Section 5. This amendment shall not take effect until the October first next succeeding its ratification and adoption by the people."

[12] Article 103 eliminated the following language: "All [public] moneys . . . shall be applied to, and expended in, no other schools than those . . . under the order and superintendence of the authorities of the town or city in which the money is expended." The 1974 amendment made two other textual changes. The special reference to religious schools as "any school or institution of learning, whether under public control or otherwise, wherein any denominational doctrine is inculcated" was removed. Also, an exception was added to § 2, to permit the Commonwealth to make grants-in-aid available to "private higher educational institutions or to students or parents or guardians of students attending such institutions."

appropriation or use of public money or property or loan of credit shall be made or authorized by the Commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any infirmary, hospital, institution, primary or secondary school, or charitable or religious undertaking which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents authorized by the Commonwealth or federal authority or both . . . ."

This language is "clear and peremptory," and "[t]here can be no doubt that the explicit language was intentional." *Opinion of the Justices,* 357 Mass. 836, 842-843 (1970). The debates at the Constitutional Convention of 1917 reveal that one important purpose of art. 46 was to tighten the prohibition of public support for religious education.[13] "Proponents of such an amendment urged that liberty of conscience was infringed whenever a citizen was taxed to support the religious institutions of others; that the churches would benefit in independence and dignity by not relying on governmental support; and, more generally or colloquially, that to promote civic harmony the irritating question of religion should be removed from politics as far as possible, and with it the unseemly and potentially dangerous scramble of religious institutions for public funds in ever-increasing amounts." *Bloom* v. *School Comm. of Springfield, supra* at 39. A secondary purpose was to protect State and municipal treasuries from the growing pressure of interest groups in search of private appropriations. See, e.g., 1 Debates, *supra* at 87, 97-98, 163, 167. See also, R.L. Bridgman, The Massachusetts Constitutional Convention of 1917, 34 (1923).

Against this background, the school committee in the present case contends that the clear language of § 2 of the

---

[13] Religious antagonisms and concern over separation of church and State were the focus of much of the debate. See 1 Debates in the Massachusetts Constitutional Convention 1917-1918, at 62-63, 68, 74-79, 71-104, 156-157, 161-164, 211 (1919); R.L. Bridgman, *supra* at 22, 32-40.

anti-aid amendment bars the appropriation of public funds for contracts with private schools providing special education. We disagree. We hold that, on the record before us, purchase of services contracts between the school committee and private schools, as permitted under c. 766, are not made "for the purpose of founding, maintaining or aiding" such schools. Accordingly, we need not reach a second argument, raised by the Commonwealth, that such contracts fall within the "deaf, dumb or blind" exception to the anti-aid amendment contained in art. 46, § 3. See note 11, *supra*, for the text of art. 46, § 3.

4. *The constitutional standard.* We have previously considered somewhat similar challenges under art. 46, § 2. See, e.g., *Bloom* v. *School Comm. of Springfield, supra,* striking down a statute which required school committees to loan textbooks to pupils attending private schools as violative of art. 46, § 2. We have not, however, expressly set forth the criteria we consider in judging claims arising under this amendment. Compare *Colo* v. *Treasurer & Receiver Gen.,* 378 Mass. 550, 558 (1979).[14]

In an art. 46 inquiry, as in any constitutional adjudication, we must begin with the familiar principle of statutory construction that affords a statute a presumption of constitutional validity. See, e.g., *Commonwealth* v. *Henry's*

---

[14] In *Colo* v. *Treasurer & Receiver Gen.,* 378 Mass. 550, 558 (1979), we noted that the criteria established by the United States Supreme Court for judging claims arising under the First Amendment were equally appropriate to claims brought under cognate provisions of the Massachusetts Constitution. We followed four guidelines in our analysis: (1) is there a "secular legislative purpose," (2) does the primary effect of the challenged practice "neither advance nor inhibit religion," (3) is there avoidance of "excessive government entanglement" with religion and (4) does the challenged practice have a "divisive political potential?" *Id.,* quoting from *Lemon* v. *Kurtzman,* 403 U.S. 602, 612-613 (1971), and *Meek* v. *Pittenger,* 421 U.S. 349, 374 (1975) (Brennan, J., concurring in part and dissenting in part). These guidelines, while suggestive of the type of inquiry to be followed, are not appropriate to a funding challenge under art. 46, § 2, since our anti-aid amendment "marks no difference between 'aids,' whether religious or secular." *Bloom* v. *School Comm. of Springfield,* 376 Mass. 35, 45 (1978).

*Drywall Co.*, 366 Mass. 539, 541 (1974). Unless the specific constitutional provision requires a heightened standard of scrutiny, one attacking a statute upon a constitutional ground bears the heavy burden of proving the absence of any conceivable basis upon which the statute may be supported. See, e.g., *Jewel Cos.* v. *Burlington*, 365 Mass. 274, 277-278 (1974).

Beyond this basic presumption, there are no simple tests or precise lines by which we can determine the constitutionality of the challenged payments under art. 46, § 2. Cf. *Colo* v. *Treasurer & Receiver Gen.*, *supra* at 554. As a starting point, "we must view the purposes and history of the practice in relation to the purposes and history of the governing constitutional amendments." *Id.* After examining the text and legislative history of art. 46, as well as our reported decisions and decisions on somewhat similar practices by other State and Federal courts, we set forth the following criteria for consideration: (1) whether the purpose of the challenged statute is to aid private schools; (2) whether the statute does in fact substantially aid such schools; and (3) whether the statute avoids the political and economic abuses which prompted the passage of art. 46. We caution that these tests "are not 'precise limits to the necessary constitutional inquiry,' but are instead guidelines to a proper analysis." *Colo* v. *Treasurer & Receiver Gen.*, *supra* at 558, quoting from *Meek* v. *Pittenger*, 421 U.S. 349, 359 (1975).

5. *Analysis.* Bearing in mind the heavy burden upon the school committee to overcome the presumption of constitutional validity attaching to the challenged provisions of c. 766, we turn to a discussion of the three factors set forth above. Although we discuss each factor separately, we note that they are, in fact, cumulative and interrelated, and that our conclusion results from a balancing of the various interests at stake in this case.

A. *Purpose test.* We first consider whether the challenged use of public money under c. 766 is "for the *purpose* of founding, maintaining or aiding" private schools (emphasis supplied).

The legislative purpose in enacting St. 1972, c. 766, is clear. Section 1 of the statute states in part that "[i]n the light of the policy of the Commonwealth to provide an adequate, publicly supported education to every child resident therein, it is the purpose of this act to provide for a flexible and uniform system of special education program opportunities for all children requiring special education; . . . and to prevent denials of equal educational opportunity . . . in the provision of differential education services." See also *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 514 (1975).

In addition to stating this clearly legitimate State purpose, the preamble listed other legislative goals. According to St. 1972, c. 766, § 1, the statute was intended to replace the previously existing and unsatisfactory statutory scheme, which had resulted in the stigmatizing of children with special needs, in an "inadequate and anti-equalizing formula" for the distribution of State aid for special education programs, and in little accountability, either before or after placement, for decisions made while evaluating a child's special needs.

On its face, therefore, the statutory purpose behind c. 766 does not fall within the prohibition contained in art. 46, § 2. In contrast, see the unconstitutional statutory purpose evidenced in a proposed statute entitled "Nonpublic Education Assistance," discussed in *Opinion of the Justices*, 357 Mass. 836, 836 (1970).[15]

Our inquiry into the purpose of c. 766 does not, of course, stop here. While the preamble and title to a statute are legislative statements entitled to weight in discerning the statute's purpose, see *Island Properties, Inc.* v. *Martha's Vineyard Comm'n*, 372 Mass. 216, 228 & n.24 (1977), we must look beyond the statute's articulated purpose in an art. 46, § 2, determination. Since the form of payment to a pri-

---

[15] The title of St. 1972, c. 766, is "An Act further regulating programs for children requiring special education and providing reimbursement therefor."

vate school is not dispositive on the issue whether the payment is prohibited, our examination of the statutory scheme will attempt to detect any "technique of circumvention." *Bloom* v. *School Comm. of Springfield, supra* at 47.

After examining the statutory scheme presented by c. 766, we do not infer an illegitimate State purpose to aid private schools. The statute does not deal exclusively with private school placements. Indeed, the statute carries with it a strong presumption that a child should be "mainstreamed" into the regular public school system if possible. G. L. c. 71B, § 3. Furthermore, private placements are authorized only when the appropriate special education program, as described in the child's individualized education plan, is not available within the public school system. Even more significantly, the statute does not permit the reimbursement of money which is spent for a child who unilaterally enrolls in a private school. The private placement provisions of c. 766 only apply to a child who seeks services in the public school system and who is then identified as requiring special services which the school system either cannot, or chooses not to, provide. Cf. *Amherst-Pelham Regional School Comm.* v. *Department of Educ.,* 376 Mass. 480, 491-492 & n.7 (1978). In the present case, even the school committee agrees with the Commonwealth, in their statement of agreed facts, that when a local school system recommends placement of a child with special needs at a private school, "the purpose of the placement is to provide the child with an appropriate special education program . . . which is not available within the public school system."

Under the narrow circumstances presented here, we find no hidden legislative purpose to aid or maintain private schools. We emphasize that c. 766 guarantees an equal educational opportunity to those children with special needs who seek one within the public school system. St. 1972, c. 766, § 1. G. L. c. 71B, §§ 2, 3. We further emphasize that c. 766 permits, but does not mandate, private placements and permits them as a last alternative. Thus, we conclude that the purpose of c. 766, revealed through its

actual functioning as described on the record before us, corresponds to the Legislature's stated purpose. The statute's purpose is, primarily, to help specified children with special needs obtain the education which is theirs by right. A secondary purpose is to assist the public school system to provide the appropriate education to each individual child.

A comparison of the statutory scheme presented by c. 766 with our cases finding violations of art. 46, § 2, is instructive. In *Bloom* v. *School Comm. of Springfield, supra,* we struck down a statute requiring school committees to loan textbooks to pupils attending private schools. We found such a program to involve the use of public property for the purpose of aiding private schools in carrying out their essential function. While we did not expressly discuss the illegitimate purpose inherent in the scheme, we can infer no purpose to the scheme other than to aid private schools, and the children who choose to attend such schools. In contrast, the primary purpose under c. 766 is to benefit public schools and individual children, by ensuring individualized plans to the children in need thereof, and by allowing public schools the right to enter into contracts for delivery of the required services which the public system did not find economically feasible to provide within the system. See *Opinion of the Justices,* 357 Mass. 836 (1970), where we advised that a proposed bill to provide for the purchase by the Commonwealth of secular educational services from nonpublic schools violated art. 46, § 2. The bill's stated purpose was to render assistance to nonpublic schools. In support of the bill, the Legislature declared that the total educational resources of the community must be utilized to resolve an educational crisis resulting from an extreme increase in the cost of education. The bill would have allowed the State to contract with private schools rather than pay the full cost of educating within the public school system, those students who, "in the exercise of conscience," obtain their education in private schools. In contrast, as seen above, c. 766 explicitly prefers to place students with special needs in public schools. Those children placed in private schools under c. 766 are placed not by choice but by necessity.

This analysis is also consistent with the "child benefit" theory, which has been employed by the United States Supreme Court to validate, in the face of First Amendment challenges, general programs which benefit all children, despite the fact that indirect or incidental benefits flow to sectarian schools. See, e.g., *Board of Educ. of Cent. School Dist. No. 1* v. *Allen,* 392 U.S. 236, 243-244 (1968); *Everson* v. *Board of Educ. of Ewing,* 330 U.S. 1, 17-18 (1947). See also Rep. A.G., Pub. Doc. No. 12, at 370 (1966); *Butler* v. *United Cerebral Palsy of N. Ky., Inc.,* 352 S.W.2d 203 (Ky. Ct. App. 1961) (finding that a statute authorizing public aid to private institutions for the education of "exceptional children" had a valid public purpose).

We note, finally, that the history of art. 46, as amended, supports our somewhat lengthy examination of the stated and actual purpose of c. 766. The opening clause of § 2 of the 1917 amendment contained broad language prohibiting the expenditure of public funds; the clause was not modified by the "for the purpose of" phrase contained in the second clause of § 2. In 1974, art. 103 eliminated that opening clause. See note 12, *supra.* Thus the purpose, as well as the effect, of a statute must now be considered in any determination of constitutional validity under art. 46, § 2.

B. *Substantial aid test.* We turn now to an examination of whether the disbursement of public funds under the challenged provisions of c. 766 substantially aids private schools.

In *Opinion of the Justices,* 357 Mass. 836 (1970), the Justices advised that the purchase of secular educational services from private schools by the Commonwealth would violate art. 46, § 2. The proposed bill would have reimbursed nonpublic schools for the actual cost of furnishing instruction in the basic school curriculum, including teachers' salaries, textbooks, instructional material, and standard educational testing. We concluded that such reimbursement would be a substantial if not a major portion of the total expense of such a school; accordingly, "such substantial assistance to a nonpublic school from public funds amounts to 'aiding.'" *Id.* at 843.

The statutory scheme under c. 766 is distinguishable from the invalid scheme described in *Opinion of the Justices, supra.* Implicit in our opinion was the definition of "aid" as "substantial assistance." To say, as we did, that "[t]he language [of § 2] unquestionably was designed to preclude entirely aid to all nonpublic institutions from appropriated public funds," *id.* at 844,[16] is not to express the whole test we apply. Rather, the statement necessarily incorporates the definition of "aid" enunciated above.

There is nothing in the record before us which reveals what portion of private school "slots" are filled with students placed by the Springfield school committee, or by public schools, in general. However, the record suggests that private placements comprise a small fraction of the number of students in the c. 766 program. For example, Springfield placed approximately four per cent of its special needs students (141 out of 3,309 students) in private day and residential programs in 1978-1979. The impact on the public school system of these placements under c. 766 is minimal compared to the impact of funding for private school students — 19.1% of the entire school age population — affected by the legislation struck down in *Opinion of the Justices, supra.*

Additionally, as seen above, the benefits of c. 766 flow first to individual special needs students, and to public schools, but only secondarily and indirectly to private schools. Thus, the type of "aid" granted to private schools under c. 766 also is distinguishable from types of invalid aid. Contrast *Sheldon Jackson College* v. *State,* 599 P.2d

---

[16] We note that we have defined "public money" under art. 46, § 2, as money raised by State or local taxation. *Opinion of the Justices,* 374 Mass. 843, 856 (1978). *Opinion of the Justices,* 354 Mass. 779, 784 (1968). Thus, to the extent that Springfield could meet its costs for c. 766 private school placements through Federal funds received under the Assistance for Education of All Handicapped Children Act, 20 U.S.C. §§ 1401 et seq. (1976), that portion of the placements in private schools would be constitutionally acceptable whatever our determination on the broader issues in this case. See Rep. A.G., Pub. Doc. No. 12, at 39 (1966). Cf. *Wheeler* v. *Barrera,* 417 U.S. 402, 417-419 (1974).

127 (Alas. 1979), which found that a tuition grant program to students attending private colleges was not neutral in its effect. Because the direct benefit of the program went to private educational institutions and their students, the court struck down the statute as a violation of the State constitutional prohibition upon payment of public funds for the direct benefit of religious or other private educational institutions.

Furthermore, various safeguards ensure that any public money spent for private placements is in direct return for services actually rendered. Cf. *Committee for Pub. Educ. & Religious Liberty* v. *Regan,* 444 U.S. 646, 659 (1980) (statute challenged under First Amendment provided "ample safeguards against excessive or misdirected reimbursement"). Moreover, a child's progress within a private school is closely monitored by public school officials. The school must document its compliance with the plan prepared by the public school system. 603 Code Mass. Regs. § 28, par. 804.1 (1979). The private school is required by regulation to review a child's progress at least once every three months to determine if the child can be placed in a less restrictive program. 603 Code Mass. Regs. § 28, par. 804.2 (1979). Additionally, the school committee must provide for a review of the progress of all special education students, including those placed in private schools, at least once a year. G. L. c. 71B, § 3. 603 Code Mass. Regs. § 28, par. 333.0 (1979).

This close monitoring of a child placed in a private school, and of the private school itself under c. 766 and its regulations,[17] suggests that both in purpose and effect the statute does not aid the private school in carrying out its essential function. Cf. *Bloom* v. *School Comm. of Spring-*

---

[17] This close monitoring of the private schools by the State suggests a further question not raised by the record before us — whether the ongoing close supervision of private school placements by public school authorities under c. 766 might involve excessive entanglement between the State and sectarian schools under the First Amendment to the Constitution of the United States. See, e.g., *Lemon* v. *Kurtzman,* 403 U.S. 602, 619 (1971). See also *Wolman* v. *Walter,* 433 U.S. 229, 244-248 (1977) (no excessive entanglement in program authorizing expenditure of public funds to provide "therapeutic services" for nonpublic school students, including pro-

*field, supra* at 41-42. Rather, the statutory scheme fulfils the obligation of the public school system which has itself chosen not to provide the services in its own schools. Cf. *Butler* v. *United Cerebral Palsy of N. Ky., Inc.,* 352 S.W.2d 203, 205-206 (Ky. Ct. App. 1961), quoting from *Hager* v. *Kentucky Children's Home Soc'y,* 119 Ky. 235, 246 (1904): "The financial aid provided by this legislation goes directly to the school, but the ultimate beneficiary is the 'exceptional' child. That the state chooses a private institution as its instrumentality does not despoil the public nature of the appropriation, for it has been said 'that the vital point in all such appropriations is whether the purpose is public; and that, if it is, it does not matter whether the agency through which it is dispensed is public or is not; that the appropriation is not made for the agency, but for the object which it serves; the test is in the end, not in the means.'"

C. *Political and economic abuse test.* In our determination of the constitutionality of c. 766, under art. 46, § 2, we must also examine the history and purpose of the amendment. See *Bloom* v. *School Comm. of Springfield, supra* at 43 n.16: "Inconsistent with the text of the anti-aid amendment, the instant legislation is also inconsistent with its purposes . . . ." In contrast, we find c. 766 to be consistent with the text of the anti-aid amendment, and also with the underlying purposes of the amendment.

---

grams for the deaf, dumb, blind, emotionally disturbed and physically handicapped children, where such services were provided at a neutral site off the premises of the nonpublic schools). Compare *Americans United for Separation of Church & State* v. *Porter,* 485 F. Supp. 432, 438-444 (W.D. Mich. 1980) (dual enrollment program instituted by public school system, in which public school annex was operated in leased portion of parochial school, fostered excessive government entanglement with religion); with *National Coalition for Pub. Educ. & Religious Liberty* v. *Harris,* 489 F. Supp. 1248, 1265-1270 (S.D.N.Y.), appeal dismissed, sub nom. *National Coalition for Pub. Educ. & Religious Liberty* v. *Hufstedler,* 449 U.S. 808 (1980) (use by school board of funds appropriated under Title I of the Elementary and Secondary Education Act of 1965 for remedial education of parochial school students by public school teachers on premises of parochial schools during regular school hours did not create excessive entanglement). We express no opinion on the merits of such an entanglement argument as applied to sectarian school placements under c. 766.

As seen above, the 1917 constitutional convention was concerned about aid to sectarian institutions and, more generally, with halting the politically divisive and financially wasteful practice of direct aid to private schools and institutions.  Under c. 766, public monies are spent for a limited purpose and only after a specific child is identified with special needs which cannot be provided for in the public school.  Therefore, c. 766 does not, in any way, support the on-going maintenance of private schools by lessening the financial burden of those who have elected a private school education.  General appropriations under the act are made to a school committee within its annual budget. G. L. c. 71B, §§ 5, 10.  See 603 Code Mass. Regs. § 28, par. 504.5 (1979).  Only a detailed review and appeal process determines an individual child's needs, and the appropriate placement for that child.  G. L. c. 71B, § 3.  See generally 603 Code Mass. Regs. § 28, pars. 300.0-411.0 (1979).  Additionally, the private school must be approved by the department, G. L. c. 71B, § 5, and the rate charged must be approved by the Rate Setting Commission.  G. L. c. 6A, § 32.  114.4 Code Mass. Regs. §§ 2.00, 3.00 (1979). Thus, professional and personal checks and balances, not political pressures, determine how the public money will be allocated.  The act does not promote aid to sectarian institutions, and is neither politically divisive nor financially wasteful.  Cf. *National Coalition for Pub. Educ. & Religious Liberty* v. *Harris*, 489 F. Supp. 1248, 1269-1270 (S.D.N.Y.), appeal dismissed sub nom. *National Coalition for Pub. Educ. & Religious Liberty* v. *Hufstedler*, 449 U.S. 808 (1980).

After examining the above three factors, we hold that the school committee has not met its burden of proving that the payment of public funds under a contract for services with a private school, as allowed under c. 766, violates art. 46, § 2, of the Amendments to the Constitution of Massachusetts. Accordingly, we remand this case to the Supreme Judicial Court for Suffolk County, where a judgment is to be entered consistent with the terms of this opinion.

*So ordered.*