CYPHER, J. (dissenting).
I respectfully dissent. Separation of church and State is a vital constitutional requirement under the Massachusetts Declaration of Rights and the United States Constitution and an enduring principle of the Commonwealth. As the court recounts, Massachusetts has an interesting and complex history in this regard. Nevertheless, I would affirm the order denying the motion for an injunction to block the town's use of the Community Preservation Act (act) to preserve the historic façade of the Acton Congregational Church, which is located in the town center.
I agree with the majority that grants of public funds to active religious institutions pursuant to the act are not categorically barred by the anti-aid amendment, and that such grants are instead subject to the three-factor test this court first articulated in Commonwealth v. School Comm. of Springfield, 382 Mass. 665, 675, 417 N.E.2d 408 (1981) ( Springfield ). As the court points out, this test requires that we consider (1) whether the purpose of the challenged grant is to aid a private charity; (2) whether the grant does in fact substantially aid a private charity; and (3) whether the grant avoids the political and economic abuses that prompted the passage of the anti-aid amendment.[1] I do not think that *720 the motion judge misapplied those three factors here. **107 I am also concerned with the court's admonition that grants of community preservation funds to active religious institutions warrant particularly "careful scrutiny." Such an analysis is belied by the plain text of the anti-aid amendment, as well as this court's cases interpreting the amendment, which dictate that we do not treat religious and secular entities differently under the amendment. The court's focus on a grant applicant's status as an active house of worship also implicates the most recent United States Supreme Court decision in this area, Trinity Lutheran Church of Columbia, Inc. v. Comer, --- U.S. ----, 137 S.Ct. 2012, 2024, 198 L.Ed.2d 551 (2017) ( Trinity Lutheran ). Trinity Lutheran holds that a State cannot condition participation in a generally-available public benefit program on an applicant's "renounc[ing] its religious character."[2] Id. Finally, I write to underscore the importance of preserving our State's historic buildings, which embody the Commonwealth's rich past and offer those in the present a number of public benefits. Historic churches and meeting houses are, like secular historic buildings, an indispensable part of our historic landscape, and warrant the same degree of preservation.
As I understand the judge's decision, she examined the purpose of the grant and found that the taxpayers did not satisfy the first Springfield factor in their challenge. She stated in her decision that the taxpayers "failed to demonstrate that the purpose of the grants is to aid the [c]hurch [ ]." And in the judge's discussion of this factor, she correctly stated that a court's inquiry does not depend on "the stated purpose of the recipients."
**108 Boston Edison Co. v. Boston Redevelopment Auth., 374 Mass. 37, 62-63, 371 N.E.2d 728 (1977) (where Legislature has provided specific standards, "the purpose of the applicants in proposing the project is wholly irrelevant").[3] At the hearing on the request *721 for a preliminary injunction, the parties emphasized the grant, not the act itself, and the judge noted in her decision that under Helmes she was to consider the purpose of the grants. Helmes v. Commonwealth, 406 Mass. 873, 877, 550 N.E.2d 872 (1990). When the judge set out the factors, she identified each one as concerning the grants, not the act.
Turning to the grants themselves, it is readily apparent that they have a public purpose of historic preservation and require a recipient to convey a preservation restriction as an express condition of the grant. G. L. c. 44B, § 12 (a ). See G. L. c. 184, § 31 (defining preservation restriction). The public receives a real property interest in exchange for the grant. Moreover, the town enjoys "every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare." LaPointe v. License Bd. of Worcester, 389 Mass. 454, 459, 451 N.E.2d 112 (1983).[4] There is nothing in the record that suggests any irregularity in the grant process in this case. To the contrary, the town and its Community Preservation Committee (committee) complied with all of the rigorous requirements of the act for these grants. After a public hearing, the committee voted unanimously to recommend the projects to the town meeting, based in part on "the significance of the historical resource[s]" that were to be preserved. Following additional favorable recommendations by the town's board of selectmen and its finance committee, residents at the town meeting voted to approve the grants for these projects in April, 2016. These grants received full scrutiny and endorsement by the residents of the town at multiple levels of town government.
**109 The judge found that the first and third prongs of the test had been satisfied by the town.[5] With regard to the second factor, the judge assumed for the purposes of the analysis that the taxpayers would be able to show that the grants in fact substantially aided the church and she then conducted the balancing test, concluding that the grants did not run afoul of the anti-aid amendment.[6] She did not ignore *722 the second factor; rather, the judge balanced the various factors, which are "cumulative and interrelated," Springfield, 382 Mass. at 675, 417 N.E.2d 408, in reaching her conclusion that the town had not violated the anti-aid amendment by issuing the preservation grant.[7]
The anti-aid amendment itself makes no distinction between secular and religious recipients of public funds; rather, as the court acknowledges, "the operative language in the amendment's two clauses is identical." Ante at 83, 92 N.E.3d at 702. Indeed, as this court's **110 anti-aid amendment cases repeatedly state, the amendment "marks no difference between 'aids,' whether religious or secular." Springfield, 382 Mass. at 674, n.14, 417 N.E.2d 408, quoting Bloom v. School Comm. of Springfield, 376 Mass. 35, 45, 379 N.E.2d 578 (1978). See Opinion of the Justices, 401 Mass. 1201, 1203 n.4, 514 (N.E.2d 353 1987) ; Attorney Gen. v. School Comm. of Essex, 387 Mass 326, 332 n.3, 439 N.E.2d 770 (1982). In my view, we cannot treat a religious institution differently from a secular private institution if we are to respect the text of the amendment and our own precedent. Applying that principle to this case, I conclude that the application of the three-factor Springfield test to religious institutions should be no more rigorous than the application of the test to any other grant under the act to any other secular private or charitable organization.[8]
In addition, although this case primarily concerns the State anti-aid amendment, our decision must also be mindful of applicable Federal constitutional provisions, such as the religion clauses of First Amendment to the United States Constitution. In Trinity Lutheran, decided this past June, the Supreme Court struck down a State's policy of denying public grants to religiously-affiliated applicants as a violation of the free exercise clause. Trinity Lutheran, 137 S.Ct. at 2024. The policy at issue there was based on a State constitutional provision requiring "[t]hat no money shall ever be taken from the public treasury, directly, or indirectly, in aid of any church." Id. at 2017. The court distinguishes Trinity Lutheran from the present *723 case by stating that, unlike the State constitutional provision there, Massachusetts's anti-aid amendment is not a categorical ban on religious institutions applying for and receiving public grants. In my opinion, however, Trinity Lutheran carries broader implications.
The Supreme Court further observed that a State policy requiring an applicant for public funds "to renounce its religious character in order to participate in an otherwise generally available public benefit program is," absent "a [S]tate interest 'of the **111 highest order,' " "odious to our Constitution" (citation omitted). Id. at 2024-2025. As I read the court's analysis in this case, a historic religious building with an active congregation is at a distinct disadvantage when seeking funds under the act-at least for purposes of a court's anti-aid scrutiny of that building's grant application-compared to historic religious buildings that are no longer active. The historic religious building would then be confronted with the "odious" choice of "having to disavow its religious character" in order to participate in the Commonwealth's community preservation program. Id. at 2022.
Finally, I write to emphasize the importance of preserving our State's historic structures, in light of the significant cultural, aesthetic, and economic benefits such preservation bestows on the Commonwealth's cities and towns. The citizens and the Legislature have determined that historic preservation is important so that future generations may appreciate the history of the Commonwealth. This determination has been expressed through the creation of a variety of historic districts and historical commissions, as well as State laws and regulations governing historic preservation.[9] We have likewise recognized this interest. See, e.g., Helmes, 406 Mass. at 877, 550 N.E.2d 872 (public money appropriated to nonprofit "to rehabilitate [a World War II] battleship, to preserve it as a memorial to citizens of the Commonwealth" served public purpose); Opinion of the Justices, 333 Mass. 773, 780, 128 N.E.2d 557 (1955) ("There has been substantial recognition by the courts of the public interest in the preservation of historic buildings, places, and districts").
"[S]tructures with special historic, cultural, or architectural significance enhance the quality of life for all," as they "represent the lessons of the past and embody precious features of our heritage." Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 108, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Likewise, the careful craftsmanship of these buildings-too often a feature of the past-"serve as examples of quality for today," ibr.US_Case_Law.Schema.Case_Body:v1">id., and improve the aesthetics of our neighborhoods. Indeed, the building that this court occupies is a testament to that, having been placed on the National Register of Historic Places in 1974, and undergoing a magnificent renovation **112 and restoration completed in 2005. Historic preservation also offers distinct economic advantages, by increasing property values, encouraging tourism, and generating local business. See, e.g., H.S. Edwards, The Guide for Future Preservation in Historic Districts Using a Creative Approach: Charleston, South Carolina's Contextual Approach to Historic Preservation, 20 U. Fla. J.L. & Pub. Pol'y 221, 223-225 (2009).
Churches, an undeniable part of the Commonwealth's historic landscape, achieve these same cultural, aesthetic, and *724 economic benefits,[10] and likewise warrant preservation. During Massachusetts's early history, civic and religious life were in many ways one in the same. The meeting house-perhaps the most iconic feature of a "quintessential New England town"-served as the center of gravity for both public administration and religious worship. See, e.g., Witte, How to Govern a City on a Hill: The Early Puritan Contribution to American Constitutionalism, 39 Emory Law J. 41, 57 (1990) ("Church meetinghouses and chapels were used not only to conduct religious services, but also to host town assemblies, political rallies, and public auctions ..."). Colonial laws often required homes to be constructed within one mile of the meeting house. See, e.g., N.B. Shurtleff, ed., 1 Records of the Governor and Company of the Massachusetts Bay in New England, 157 (1853) (reflecting 1635 order of General Court that, in certain towns, no "dwelling howse" was to be "above halfe a myle from the meeting house" without legislative permission). Especially for buildings of such historic significance-the institutional center of life in colonial Massachusetts-we should be careful not to impose undue restrictions on their access to needed preservation funds.

The evolution was summarized by Justice Souter in Mitchell v. Helms, 530 U.S. 793, 882-883, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (Souter, J., dissenting):
"In sum, 'neutrality' originally entered this field of jurisprudence as a conclusory term, a label for the required relationship between the government and religion as a state of equipoise between government as ally and government as adversary. Reexamining Everson [v. Board of Educ. of Ewing, 330 U.S. 1 [67 S.Ct. 504, 91 L.Ed. 711] (1947),]'s paradigm cases to derive a prescriptive guideline, we first determined that 'neutral' aid was secular, nonideological, or unrelated to religious education. Our subsequent reexamination of [multiple Supreme Court cases] ... recast neutrality as a concept of 'evenhandedness.' "
Evenhandedness in this context means an evenhanded treatment of religious and nonreligious institutions.

The windows are described as a "treasure, yet they are in need of care. The exterior plexiglass is no longer doing its job. Not only is it cloudy, so that the beauty of the glass cannot be appreciated outside of the church, but it is no longer weathertight.... The proposed work would remove the old plastic covers, repair the existing wood damage, replace missing or broken pieces ... to stabilize and protect the eight primary stained glass windows."

Unlike in the stained glass grant, there are other grants to churches where the secular and religious purposes may be more easily separable. The Old North Church, located in the North End neighborhood of Boston, is a good example. Funding the repair and restoration of glass windows are at issue for both houses of worship, but any similarity ends there. In 2002, the Old North Foundation applied for, and later received, a Save America's Treasure grant to preserve, among other things, the Old North Church's historic window. See Authority of the Department of the Interior to Provide Historic Preservation Grants to Historic Religious Properties Such as the Old North Church, 27 Opinions of the Office of Legal Counsel for 2003, United States Department of Justice, 91, 96, 99 (2013) (Old North Church opinion), https://www.justice.gov/olc/file/477026/download [https://perma.cc/XUT2-L54E]. Famously, in the Old North Church's steeple hung two lit lanterns to indicate that the British army was leaving Boston by boat to capture the stores of arms and ammunition located in Concord. See http://oldnorth.com/historic-site/the-events-of-april-18-1775/ [https://perma.cc/9AGF-KL9Z]. See also H.W. Longfellow, Paul Revere's Ride (1860) ("He said to his friend,-'If the British march By land or sea from the town to-night, Hang a lantern aloft in the belfry-arch Of the North-Church-tower, as a signal-light,-One if by land, and two if by sea; And I on the opposite shore will be' ").
For the grant to the Old North Church, the historical purpose is manifestly evident and is described by the National Park Service as "one of America's most cherished landmarks." Old North Church opinion at 97. The Old North Church windows also contained no overt religious message as do the stained glass windows in the town of Acton. Furthermore, for the Old North Church, rigorous auditing requirements were also in place to ensure that the grant funded only the historic aspects of the church and not its religious endeavors. Old North Church opinion at 103.

The Old North Church is again a good comparison. Great efforts were made to avoid religious assistance. See Old North Foundation Awarded $317,000 Grant Under Save America's Treasure Program, National Park Service, Press Release (May 27, 2003) (Park Service Press Release), https://www.nps.gov/aboutus/news/release.htm?id=395 [https://perma.cc/9MAN-6NGV]. The Old North Foundation, a secular, nonprofit organization, was the entity approved for the grant. See Mission Statement, Old North Foundation of Boston, Inc., http://oldnorth.com/historic-site/foundation/ [https://perma.cc/B45N-79Y5]; Park Service Press Release, supra. Furthermore, as a matching-grant program, the Old North Foundation contributed a substantial amount to the project. See National Park Service, Matching Share Requirements at 1, https://www.nps.gov/preservation-grants/manual/Matching_ Share_Requirements.pdf [https://perma.cc/RA45-3SQF] ("The Federal grant is meant to stimulate nonfederal donations-not to pay for all the work by itself").

Again, this case is unlike the Old North Church. Any risks or tensions there are substantially assuaged by the building's undeniable significance in the Commonwealth's and the country's history and because of the separability of the historic restoration work from the religious mission.

I recognize that this distinction may be subtle and even elusive as a house of worship contains many different religious symbols, but as the Supreme Court has emphasized, line drawing may be difficult but necessary in this area. See School Dist. of Abington Twp., Pa v. Schempp, 374 U.S. 203, 305-306, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring). See also Van Orden v. Perry, 545 U.S. 677, 699, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring). See generally Lupu & Tuttle, Historic Preservation Grants to House of Worship: A Case Study in The Survival of Separationism, 43 B.C. L. Rev. 1139, 1174 (2002).

With respect to the first factor set out in Commonwealth v. School Comm. of Springfield, 382 Mass. 665, 675, 417 N.E.2d 408 (1981) (Springfield ), consideration of a grant's "purpose", I disagree with the court that a court's primary focus here is on whether "one" of a grantor's motivating purposes is impermissible. See ante at 87 n.22, 92 N.E.3d at 706 n.22. Our "purpose" inquiry is limited to the intent of the grantor, without consideration of an applicant's motives for seeking grant funds. See, e.g., Boston Edison Co. v. Boston Redevelopment Auth., 374 Mass. 37, 62-63, 371 N.E.2d 728 (1977) (where the legislature has provided specific standards, "the purpose of the applicants in proposing the project is wholly irrelevant"). And as Springfield and subsequent cases make clear, that inquiry requires that we consider what "the" purpose of the grant is, see, e.g., Springfield, 382 Mass. at 675, 417 N.E.2d 408 -not, as the court states, whether "one purpose among many" might be impermissible. In instances where there may be more than one purpose for a grant, a court must consider and balance all such purposes in order to determine what "the" predominant or "primary" purpose of the grant is. Id. at 678, 417 N.E.2d 408 ("The statute's purpose is, primarily, to help specified children with special needs obtain the education which is theirs by right"). I am therefore not convinced that the plaintiffs' potential discovery of some "hidden purpose" to aid the church tips the scale in their favor under this factor, where the clear predominant purpose of these grants is historic preservation.

We have recognized that an incidental benefit to an entity is inevitable. In fact, in Helmes, we observed that a battleship would not be able to continue as a war memorial and likely would be forfeited to the Navy. Helmes, 406 Mass. at 877, 550 N.E.2d 872. See Springfield, 382 Mass. at 679-681, 417 N.E.2d 408 (secondary and indirect benefits to private schools do not qualify as "substantial aid" under anti-aid amendment). See also Attorney Gen. v. School Comm. of Essex, 387 Mass. 326, 332, 439 N.E.2d 770 (1982) ("The fact that a state law, passed to satisfy a public need, coincides with the personal desires of individuals most directly affected is certainly an inadequate reason ... to say that a legislature has erroneously appraised the public need" [citation omitted] ).

In addition to their argument concerning the risks posed by public support of religious institutions, the taxpayers voice other concerns that are not insubstantial. They claim that (1) the grant to the church violates their liberty of conscience if the grant is for a church they do not want to support; (2) the grant threatens the independence of religious institutions, making them "supplicants" for governmental aid that may bring intrusive governmental inquiries; and (3) the grant may be politically divisive and engender "religious biases" in grant making. Of course, taxpayers could make similar objections to grants provided to secular recipients. These are the concerns that the three-factor test in Springfield is designed to address.

For example, the Massachusetts Historical Commission was created by the Legislature in 1963, see St. 1963, c. 697, § 1, to identify, evaluate, and protect important historical and archaeological assets of the Commonwealth, G. L. c. 9, §§ 26 -27D, including establishing and maintaining the State Register of Historic Places, G. L. c. 9, § 26C.

According to one study conducted in 1996, the average historic religious place in an urban environment generates over $1.7 million annually in economic impact. Sacred Places, The Economic Halo Effect of Historic Sacred Places, at 4, 19 (undated), http://www.sacredplaces.org/uploads/files/16879092466251061-economic-halo-effect-of-historic-sacred-places.pdf [https://perma.cc/LEH3-5G88].